775 So.2d 759 (2000)
SISTERS OF the VISITATION
v.
COCHRAN PLASTERING COMPANY, INC.
1981513.
Supreme Court of Alabama.
March 10, 2000.
Application for Rehearing Overruled May 26, 2000.
Thomas E. Sharp III of Vickers, Riis, Murray & Curran, L.L.C., Mobile, for appellant.
James P. Green and Thomas H. Nolan, Jr., of Brown, Hudgens, P.C., Mobile, for appellee.
*760 LYONS, Justice.
The Sisters of the Visitation (hereinafter usually "the Sisters") appeal from the trial court's order enjoining the arbitration proceeding initiated by the Sisters in a dispute with Cochran Plastering Company, Inc. (hereinafter "Cochran"). The Sisters of the Visitation is a Catholic religious order that owns and operates a monastery and spiritual retreat in Mobile. The Sisters began a restoration project to repair and restore the chapel at the Visitation Monastery. The Sisters engaged the services of Hall Baumhauer Architects, P.C., an Alabama company, and entered into contracts directly with contractors, from Alabama and several other states, within specific trades included in the scope of work for the project.
The Sisters entered into a contract with Cochran, an Alabama company, for Cochran to repair cracks in the plaster in the ceilings and wall of the chapel, to cast and install plaster moldings, and to pin up all loose moldings with screws and washers. This contract included an arbitration provision, pursuant to which the Sisters filed a demand for arbitration; in the demand for arbitration, the Sisters claimed that Cochran had negligently damaged decorative paintings on the surface of the chapel ceilings and wall and that Cochran had failed to complete its work. The Sisters claimed a total of $525,000 for restoration of paintings they claimed Cochran had damaged and $50,000 for the completion of the repair work.
Cochran filed an action in the circuit court for an injunction to stop the arbitration proceeding, claiming that the arbitration provision is unenforceable, pursuant to Ala.Code 1975, § 8-1-41(3), because, it argues, the contract between it and the Sisters did not involve interstate commerce. Cochran further contends that the Sisters' claims are precluded by the clause in the arbitration provision that specifically exempts from arbitration claims relating to "aesthetic effect."
The issues raised on appeal are: (1) whether the arbitration clause in the contract between the Sisters and Cochran is made enforceable by the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 et seq., and (2) whether the claims made by the Sisters against Cochran constitute claims relating to "aesthetic effect," which are expressly excluded from the operation of the arbitration clause. Because we affirm the trial court's order enjoining the arbitration proceedings, we do not reach the second issue, concerning the scope of the arbitration agreement.
The FAA, at 9 U.S.C. § 1, defines "commerce," as that term is used within the FAA, as including "commerce among the several States or with foreign nations." Section 2 declares arbitration agreements in "a contract evidencing a transaction involving commerce" to be valid and enforceable, "save upon such grounds as exist at law or in equity for the revocation of any contract." In Allied-Bruce Terminix Companies v. Dobson, 513 U.S. 265, 115 S.Ct. 834, 130 L.Ed.2d 753 (1995) ("Terminix"), the United States Supreme Court held that for an arbitration clause to be enforceable under the FAA the transaction to which the contract relates must turn out, in fact, to involve interstate commerce, regardless of the contemplation of the parties. Id. at 278, 115 S.Ct. 834.
The United States Supreme Court, in United States v. Lopez, 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), considered the extent of interstate involvement an activity must have in order for it to be within the bounds of Congress's authority under the Commerce Clause of the United States Constitution. The Supreme Court decided Lopez shortly after it had decided Terminix. In Lopez, the Court, for the first time in 60 years,[1] struck down an act of Congress (the Gun-Free School Zones *761 Act[2]) on the basis that the act exceeded Congress's Commerce Clause authority. In Lopez, Chief Justice Rehnquist broke down the previous Commerce Clause cases into three categories of things that Congress has regulated under that clause: channels of interstate commerce (by laws freeing channels of commerce from discrimination, immoral activities, etc.); instrumentalities of interstate commerce (by laws regulating safety of vehicles used in interstate commerce); and activities having a substantial relation to commerce. Lopez, 514 U.S. at 558-59, 115 S.Ct. 1624. After establishing those categories, the Chief Justice acknowledged an absence of clarity in the cases dealing with the question whether, for an activity to be subject to Congressional regulation under the Commerce Clause, the activity must "affect" or must "substantially affect" interstate commerce. Id. at 559, 115 S.Ct. 1624.
One attempting to clarify the area of the law in which that question arises must consider Wickard v. Filburn, 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942). In that case, an Ohio farmer raised wheat on 23 acres of land. He consumed most of the wheat on his farm, either by feeding it to livestock, making flour for personal use, or using it to produce seeds for future crops. The Secretary of Agriculture assessed a penalty against the farmer for exceeding by 12 acres his allotment under a federal statute regulating wheat production. The Supreme Court upheld the assessment, holding that the Congress's limitation of the farmer's wheat production was a valid exercise of its authority under the Commerce Clause to regulate interstate commerce. Unless Wickard is either overruled or read narrowly, very little that occurs in this country can be viewed as not having some involvement with interstate commerce. The Court in Lopez, after reviewing Wickard, acknowledged that it was inappropriate to make an excessively elastic application of the Commerce Clause. It stated that for an economic activity to come within Congress's authority under the Commerce Clause the activity must "substantially affect" interstate commerce. 514 U.S. at 559, 115 S.Ct. 1624.[3]
The Lopez Court referred to the requirement of a substantial effect as generally applicable to regulation of economic activity. Id. at 560, 115 S.Ct. 1624. That broad reference, albeit dictum, does not suggest that the requirement of a substantial effect would not apply to the question whether a particular contract is subject to the FAA. We have recently embraced the concept that the Lopez requirement of a substantial effect governs the question whether a particular contract has a sufficient connection with interstate commerce to be governed by the FAA.[4] See Southern *762 United Fire Ins. Co. v. Knight, 736 So.2d 582 (Ala.1999) (Houston, Kennedy, Lyons, Brown, and Johnstone, JJ., concurring; See, J., concurring specially; Cook, J., concurring in the result; and Hooper, C.J., and Maddox, J., dissenting); and Rogers Foundation Repair, Inc. v. Powell, 748 So.2d 869 (Ala.1999) (Hooper, C.J., and Maddox, Cook, Brown, Johnstone, and England, JJ., concurring; See, J., concurring specially; Lyons, J., concurring in two of the three cases addressed in that opinion and concurring in the result in the third; and Houston, J., concurring in two of the cases).
The Chief Justice, in his dissent, relies on a case decided December 2, 1999, In re L & L Kempwood Associates, L.P., 9 S.W.3d 125 (Tex.1999), as supporting his view that the Lopez requirement of a substantial effect on interstate commerce does not apply to arbitration cases arising under the FAA. The Chief Justice quotes that part of the L & L Kempwood opinion in which the Supreme Court of Texas states that "[t]he other courts to consider this issue of which we are aware have [agreed with the view that Lopez did not restrict the scope of the FAA]." 9 S.W.3d at 127 (quoted infra at 775 So.2d 771). The Texas Supreme Court's footnote to that statement cites just two cases. One was a case from the Texas Court of Appeals in Fort Worth, Palm Harbor Homes, Inc. v. McCoy, 944 S.W.2d 716 (Tex.App.-Fort Worth 1997, orig. proceeding); the other was this Court's four-Justice opinion in Hurst. It overlooks a case decided November 23, 1999, In re Turner Brothers Trucking Co., 8 S.W.3d 370 (Tex.App.-Texarkana 1999) (a case from another Texas Court of Appeals), which stated:
"The Texas courts of appeals have split on the issue of whether `affect' or `substantially affect' interstate commerce determines whether an arbitration agreement is subject to the federal or state statute. In Palm Harbor Homes, Inc. v. McCoy, 944 S.W.2d 716 (Tex.App.-Fort Worth 1997, orig. proceeding), the Fort Worth court held that the `affect commerce' language of Allied-Bruce Terminix was not changed by the subsequent Lopez decision:
"`The extent of Congress' power to legislate is not at issue here; unlike in *763 Lopez, the Goldens have not challenged the constitutionality of the FAA. Thus, the only issue we must address is the [sic] how broad Congress intended the term "involving commerce" to be. We follow the Supreme Court in holding that a transaction involves commerce under the FAA if it "in fact" affects interstate commerce. Allied-Bruce, 513 U.S. at 268-70, 115 S.Ct. 834....'
"[944 S.W.2d] at 720.
"On the other hand, the Corpus Christi court of appeals has determined that the language of Lopez specifically holds that Congress may regulate, under the Commerce Clause, only activities `substantially affecting' interstate commerce. L & L Kempwood Assocs. [v. Omega Builders, Inc.], 972 S.W.2d [819,] 821-22 [(Tex.App.-Corpus Christi 1998, no pet.)]; see also Ikon Office Solutions, Inc. v. Eifert, 2 S.W.3d 688 (Tex. App.-Houston [14th Dist.] 1999, orig. proceeding); Russ Berrie and Co. [v. Gantt], 998 S.W.2d [713,] 715 [(Tex.App.-El Paso 1999, no pet. h.)]. The L & L Kempwood case met the issue head on, acknowledging Palm Harbor and other authority to the contrary, stating:
"`Therefore, whether "the extent of Congress's power to legislate" has been exceeded, which the Palm Harbor court thought was not at issue, is actually an element that must be established in every case before the FAA applies. Allied-Bruce held that, in establishing the FAA, Congress intended to extend the jurisdiction of the law to the maximum extent permitted under the Commerce Clause. Allied-Bruce, [513 U.S. at 274, 115 S.Ct. 834]. This aspect of Allied-Bruce remains intact after Lopez. The significant modification of the Allied-Bruce analysis that results from Lopez is that, after Lopez, the Commerce Clause permits Congress's jurisdictional [sic] to reach only as far as matters that "substantially affect" interstate commerce.'
"L & L Kempwood Assocs., 972 S.W.2d at 822 (emphasis added).
"Both the El Paso court in Berrie and the Corpus Christi court in Kempwood reviewed the record to determine whether the underlying transaction evidenced a substantial effect on interstate commerce. Russ Berrie and Co., 998 S.W.2d at 715-16; L & L Kempwood Assocs., 972 S.W.2d at 822. Both courts concluded that they did not and held the federal statute inapplicable.
"We believe the reasoning of the L & L Kempwood decision is more in keeping with the Supreme Court's Lopez decision. Therefore, we conclude that it was Turner Brothers' burden to show that the contract in issue had a substantial effect on interstate commerce."
8 S.W.3d at 375-76 (emphasis added). We prefer the reasoning of the court in Turner Brothers Trucking, a decision of which the Supreme Court of Texas was clearly unaware when it decided L & L Kempwood, which was released just a few days after Turner Brothers Trucking was decided.
In Lopez, the Court cited NLRB v. Jones & Laughlin Steel Corp., 301 U.S. 1, 37, 57 S.Ct. 615, 81 L.Ed. 893 (1937), in which the Supreme Court had warned that the scope of the Commerce Clause
"must be considered in light of our dual system of government and may not be extended so as to embrace effects upon interstate commerce so indirect and remote that to embrace them, in view of our complex society, would effectually obliterate the distinction between what is national and what is local and create a completely centralized government."
Lopez, 514 U.S. at 557, 115 S.Ct. 1624. Considering that the "complex society" in 1937, when Jones & Laughlin Steel was decided, judged by comparison to contemporary society, based, as it is, on a much more advanced technology, was perhaps slightly more than quaint, the danger the *764 Court saw then has been multiplied today many times over.
Because Wickard was by no means overruled in Lopez, we must consider it in depth. The Agricultural Adjustment Act of 1938 had as one of its primary purposes increasing the market price of wheat by reducing the supply. Exempting all home-consumed wheat from the operation of the Act would substantially influence the Government's efforts to control supply and thereby to control price. Wickard, 317 U.S. at 128, 63 S.Ct. 82. Viewing Wickard in this light, we conclude that the question whether the actions of an individual, which actions standing alone would be considered "local" actions or actions with only an "indirect" influence on interstate commerce, may be considered to have a substantial influence on interstate commerce is to be determined by considering how critical the regulation of all similarly situated persons' activity is to the accomplishment of the primary purpose of a statute drawn to regulate an activity clearly having a substantial effect on interstate commerce. Id.
The obvious primary purpose of the FAA is to make enforceable arbitration agreements appearing in contracts "evidencing a transaction involving commerce." Will it defeat the primary purpose of the FAA if some transactions occurring in today's complex society, although they have some "indirect or remote" effect upon interstate commerce, escape the sweep of the FAA? Put another way, even if those transactions are not subject to the FAA, will there remain a substantial body of transactions as to which the FAA will apply and as to which the Congressional purpose will be achieved? Or, on the other hand, will bringing those transactions within the scope of the FAA "obliterate the distinction between what is national and what is local"? See Jones & Laughlin Steel, 301 U.S. at 37, 57 S.Ct. 615.
One cannot seriously argue that unless all transactions, some of which by themselves might have only a local influence or at most an indirect connection to interstate commerce, come within the scope of the FAA, that Act will become some sort of scarecrow, lacking substance and a field of operation, so that Congress's primary purpose will be defeated. Such an expansive application of the FAA would tend to defeat the doctrine of federalism, making that doctrine a hollow shell. To recognize such a wide sweep of federal authority would stifle the States' interest in, or efforts toward, developing creative solutions to other common problems. Alabama has a robust alternative-dispute-resolution program whereby trial judges routinely call on the parties to a lawsuit to attempt to resolve their differences with the aid of a mediator, whose proposals are not binding on the parties. Whether this alternative-dispute-resolution approach is superior to arbitration is not the issue; rather, the question is whether the Commerce Clause should tolerate a State's efforts, in regard to transactions having a less-than-substantial effect on interstate commerce, to try solutions other than those that catch the fancy of Congress.
Developing a test for determining whether a particular contract has a substantial effect on interstate commerce is challenging, but it is essential, because we cannot appropriately say of such an effect, as Justice Stewart suggested we might be able to say of hard-core pornography, "I know it when I see it." Jacobellis v. Ohio, 378 U.S. 184, 197, 84 S.Ct. 1676, 12 L.Ed.2d 793 (1964) (Stewart, J., concurring). We can start with a description of a transaction that one almost intuitively finds lacking the effect on interstate commerce that the Framers contemplated and, then, through a process of reverse engineering, break it down into components and thereby develop a set of standards.
Consider a hypothetical transaction involving a farmer who owns a tractor that he purchased from a local dealer. The farmer earns a substantial portion of his annual income through contracts with other local landowners, contracts calling for *765 him to use the tractor to mow their pasture land and to occasionally rake and burn limbs, leaves, and grass clippings. He purchases gasoline to operate the tractor and diesel fuel to start the trash fires. The other landowners have crops that they regularly harvest and ship in interstate commerce, but this farmer is not involved in any activity relating to those crops other than his clearing the land so that the others might thereafter plant their crops. One can hardly say that to permit this farmer's transactions and those of all persons similarly situated to escape the sweep of the FAA would frustrate the primary purpose of that Act. A substantial universe of contracts would remain within the scope of the FAA even if this class of transactions is set outside that scope, and by setting these transactions outside that scope what is local would remain local and would escape control by a centralized government.
This hypothetical transactionan agreement by the farmer to do work for another local landownermight contain the following components: (1) a contract solely between two local parties, both of them engaging in activities that do not involve any person or entity in another State; (2) tools and equipment, which, although they moved in interstate commerce, were not purchased or leased solely for the farmer to perform the particular contract at issue; (3) substantially more than half of the amount paid to the farmer by the other landowner is allocable to the cost of the services rendered by the farmer, who renders those services without using persons or entities from another State, while substantially less than half of the amount paid is allocable to the cost of materials specially purchased for use or consumption in the farmer's performance of the contract; (4) the object of the services is incapable of subsequent movement across State lines or otherwise having a subsequent substantial effect on interstate commerce; (5) such a degree of separability from any contracts that are subject to the FAA that allowing this contract to remain outside the scope of the Act would not substantially disrupt activities that Congress intended to be subject to the Act.
The United States Supreme Court, as previously noted, held in Terminix, supra, that, to be subject to the FAA, a contract must relate to a transaction that in fact involves interstate commerce, even if the parties, when they entered the contract, did not contemplate the involvement with interstate commerce. 513 U.S. at 281, 115 S.Ct. 834. Because it is the Sisters who seek to compel arbitration, they have the burden of proving that the transaction in this case affected interstate commerce. See Transouth Fin. Corp. v. Bell, 739 So.2d 1110, 1114 (Ala.1999). We look at this transaction in light of these principles.[5]

I. Citizenship of the Parties
The Sisters of the Visitation and Cochran are both Alabama residents, and the contract was to be performed in Alabama. The only affiliation of any of the parties with out-of-state entities is found in the relationship between the Sisters and the Roman Catholic Church. We are simply not prepared to recognize that relationship as commercial activity in interstate commerce, analogous to the network of Terminix franchises across the country. See Terminix, 513 U.S. at 282, 115 S.Ct. 834. This transaction involves a contract solely between two local parties, each of whom is unaffiliated with an entity involved in interstate commerce.

*766 II. Tools and Equipment

One must assume that Cochran brought tools and equipment to the project site, but the record is silent as to whether they were leased or purchased specially for the project and, if so, whether they had moved in interstate commerce. In connection with this project, a substantial contract for the rental of scaffolding was placed with an out-of-state party; however, it appears that this contract did not involve Cochran but was let directly by the Sisters. No substantial effect on interstate commerce can be developed based on Cochran's acquiring in interstate commerce any tools and equipment to be used in the performance of this contract.

III. Allocation of Cost of Services and Materials
We have no indication that Cochran employed out-of-state workers, so we assume that its workers were local. The contract apparently specified the use of plaster and washers that were required to be obtained from outside the State, and it called for insurance, which was obtained from an insurance company from outside the State. However, the record provides no information from which we can determine what portion of the amount the Sisters paid Cochran is allocable to the cost of local labor and overhead and what portion is allocable to materials or services specially purchased for use or consumption in performance of the contract. The Sisters have not presented sufficient evidence to justify the conclusion that Cochran's contract substantially affects interstate commerce by reason of a dependence upon materials and services moving in interstate commerce.

IV. Subsequent Movement Across State Lines
The object of the services provided by Cochran is incapable of subsequent movement across state lines or of otherwise having a subsequent substantial effect on interstate commerce. The Sisters contracted with Cochran to perform plaster work in the Visitation Monastery Chapel in Mobile, Alabama. The work to be performed included repairing cracked plaster in the ceilings and walls, installing plaster moldings, and pinning loose moldings. Cochran's work becomes a part of the structure of the Visitation Monastery Chapel and it cannot be detached from the chapel and moved across state lines. The fact that people from out of the State might have visited the site later is too tenuous a connection with interstate commerce. Therefore, we conclude that Cochran's work will not have a subsequent effect on interstate commerce.

V. Degree of Separability From Other Contracts
The Sisters entered into a series of contracts for the restoration of a chapel. The scope of the entire project included installing a fire-alarm system and electrical wiring; filling cracks in plaster walls; pinning up loose plaster moldings on the ceiling of the chapel; restoring painted ornamental decorations on the plaster walls and ceiling following plaster repairs; installing heating, ventilation, and air-conditioning duct-work and equipment; restoring stained glass windows; removing and restoring statuary and framed paintings; and erecting scaffolding covering the entire floor space. The contract with Cochran called for Cochran to perform plaster work pursuant to specifications prepared by a resident of Texas who traveled to Mobile for the purpose of studying the plastering project and writing the specifications for it. Cochran's payment under the contract constituted 10% of the entire cost of the project.
Cochran's contract is related to several other contracts, apparently also made directly with the Sisters, including a contract with the architect for the chapel project; contracts with workers in the various trades whose work was called for in the foregoing description of the scope of the work; and a contract with the Texas resident who prepared the specifications *767 for the plaster work. The fact that several of the related contracts have a substantial effect on interstate commerce cannot be seriously disputed. However, we should not hold that the proximity of this particular contract to contracts substantially affecting interstate commerce is determinative, lest we err by expanding the Commerce Clause to the point of "effectually obliterat[ing] the distinction between what is national and what is local." Jones & Laughlin Steel, 301 U.S. at 37, 57 S.Ct. 615.
Heeding the Supreme Court's teaching in Terminixthat for a contract to be subject to the FAA the transaction to which the contract relates must turn out, in fact, to involve interstate commercewe must look to the effect Cochran's contract will in fact have on those other contracts that do have a substantial effect on interstate commerce, if Cochran's contract is held to fall outside the reach of the FAA and thus be subject to state-law defenses to the enforcement of arbitration clauses. The record before us does not clearly indicate whether the repair-and-restoration project is complete, although the materials before us refer to costs incurred in corrective work made necessary by Cochran's alleged breach; those references indicate that the project has been completed. In any event, the Sisters do not contend that the delays or distraction attendant to litigation, as opposed to the ostensibly simpler mode of dispute resolution afforded by arbitration, would disrupt the performance of the other contracts that have a substantial effect on interstate commerce. Therefore, recognizing the separability of this economic activity between the Sisters and Cochran does not substantially disrupt those activities that are subject to the FAA, because Cochran's contract cannot be said to substantially affect interstate commerce by reason of its impact on other contracts that do substantially affect interstate commerce.
The Sisters have not proven that the transaction substantially affects interstate commerce and, therefore, the contrary rule of the FAA does not displace Ala.Code 1975, § 8-1-41(3), prohibiting the specific enforcement of a predispute arbitration agreement.
AFFIRMED.
HOUSTON, COOK, JOHNSTONE, and ENGLAND, JJ., concur.
BROWN, J., concurs in the result.
HOOPER, C.J., and MADDOX and SEE, JJ., dissent.
JOHNSTONE, Justice (concurring).
I concur entirely in the majority opinion. I write only to emphasize the bearing of constitutional federalism on this case and the bearing of this case on constitutional federalism.
While Allied-Bruce Terminix Companies, Inc. v. Dobson, 513 U.S. 265, 115 S.Ct. 834, 130 L.Ed.2d 753 (1995), does hold that Congress intended for the Federal Arbitration Act to reach expansively as far as the Commerce Clause would allow, Congressional intent does not govern the reach of the Commerce Clause itself. The intent of the framers of the United States Constitution determines the reach of the Commerce Clause, and the Federal Arbitration Act cannot reach any further. The case of United States v. Lopez, 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), with its substantial-effect rule, is helpful because it addresses the reach of the Commerce Clause itself rather than the Congressional intent in adopting the Federal Arbitration Act.
In other words, conceding that Congress sought to exercise as much power as it possibly could in adopting the Federal Arbitration Act, the expansive intent of the Congress is limited by the Commerce Clause, which should be interpreted, not according to the intent of Congress, but according to the intent of the framers of the United States Constitution. The following quotations from the Federalist Papers are instructive in this regard:

*768 "The powers delegated by the proposed constitution to the federal government, are few and defined. Those which are to remain in the state governments, are numerous and indefinite. The former will be exercised principally on external objects, as war, peace, negotiation, and foreign commerce; with which last the power of taxation will, for the most part, be connected. The powers reserved to the several states will extend to all the objects, which, in the ordinary course of affairs, concern the lives, liberties and properties of the people; and the internal order, improvement, and prosperity of the state.

"The operations of the federal government will be most extensive and important in times of war and danger; those of the state governments in times of peace and security. As the former periods will probably bear a small proportion to the latter, the state governments will here enjoy another advantage over the federal government. The more adequate indeed the federal powers may be rendered to the national defence, the less frequent will be those scenes of danger which might favor their ascendancy over the governments of the particular states."
The Federalist Number XLIV, at 215-16 (James Madison) (New Ed. 1857). (Emphasis added.)
"The powers included in the third class, are those which provide for the harmony and proper intercourse among the states.
"Under this head, might be included the particular restraints imposed on the authority of the states, and certain powers of the judicial department; but the former are reserved for a distinct class, and the latter will be particularly examined, when we arrive at the structure and organization of the government. I shall confine myself to a cursory review of the remaining powers comprehended under this third description, to wit: to regulate commerce among the several states ....
"The defect of power in the existing confederacy, to regulate the commerce between its several members, is in the number of those which have been clearly pointed out by experience. To the proofs and remarks which former papers have brought into view on this subject, it may be added, that without this supplemental provision, the great and essential power of regulating foreign commerce, would have been incomplete and ineffectual. A very material object of this power was the relief of the states which import and export through other states, from the improper contributions levied on them by the latter. Were these at liberty to regulate the trade between state and state, it must be foreseen, that ways would be found out, to load the articles of import and export, during the passage through their jurisdiction, with duties which would fall on the makers of the latter, and the consumers of the former. We may be assured, by past experience, that such a practice would be introduced by future contrivances; and both by that and a common knowledge of human affairs, that it would nourish unceasing animosities, and not improbably terminate in serious interruptions of the public tranquillity. To those who do not view the question through the medium of passion, or of interest, the desire of the commercial states to collect, in any form, an indirect revenue from their uncommercial neighbors, must appear not-less impolitic than it is unfair; since it would stimulate the injured party, by resentment as well as interest, to resort to less convenient channels for their foreign trade. But the mild voice of reason, pleading the cause of an enlarged and permanent interest, is but too often drowned before public bodies as well as individuals, by the clamors of an impatient avidity for immediate and immoderate gain.

*769 "The necessity of a superintending authority over the reciprocal trade of confederated states, has been illustrated by other examples as well as our own. In Switzerland, where the union is so very slight, each canton is obliged to allow to merchandize, a passage through its jurisdiction into other cantons, without an augmentation of the tolls. In Germany, it is a law of the empire, that the princes and states shall not lay tolls or customs on bridges, rivers, or passages, without the consent of the emperor and diet; though it appears from a quotation in an antecedent paper, that the practice in this, as in many other instances in that confederacy, has not followed the law, and has produced there the mischiefs which have been foreseen here. Among the restraints imposed by the union of the Netherlands on its members, one is, that they shall not establish imposts disadvantageous to their neighbors, without the general permission."
The Federalist Number XLII, at 195-96 (James Madison) (New Ed. 1857). (Emphasis added.)
Thus the intended purposes of the Commerce Clause, at least as sensed and expressed by Madison, were principally to prevent interstate rivalries and conflicts, waged by the imposition of tariffs, duties, and other taxes, from impeding foreign commerce and secondarily to prevent such rivalries and conflicts from impeding the trade between and among the states themselves. The Commerce Clause empowers Congress to enact statutes to accomplish these purposes but implicitly limits the reach of such statutes to these purposes. Expressio unius est exclusio alterius.
On the other hand, the Tenth Amendment to the United States Constitution provides:
"The powers not delegated to the United States by the Constitution, nor prohibited by it to the states, are reserved to the states respectively, or to the people."
As Madison, as already quoted, has explained,
"The powers reserved to the several states ... extend to all the objects, which, in the ordinary course of affairs, concern the lives, liberties and properties of the people; and the internal order, improvement, and prosperity of the state."
The application of Alabama's anti-arbitration statute, § 8-1-41(3), Ala.Code 1975, to the contract between the Sisters and Cochran fits this description of powers reserved to the states.
Today's decision obeys these constitutional principles of federalism by following the substantial-effect rule that this Court recognized from Lopez, supra, adopted in Southern United Fire Ins. Co. v. Knight, 736 So.2d 582 (Ala.1999), and followed in Rogers Foundation Repair, Inc. v. Powell, 748 So.2d 869 (Ala.1999). The substantial-effect rule honors the purposes of the Commerce Clause but concomitantly honors the reserved powers of the states. The test developed by today's decision honors real meaning in the word substantial.
Today's dissents, on the other hand, attack the substantial-effect rule and urge an extreme and absolute rule, variously worded, essentially that any effect on interstate commerce will subject a contract to the Federal Arbitration Act. Such a rule would, in reality, subject all contracts, no matter how small or local, to the Federal Arbitration Act and would thereby violate, and further erode, constitutional principles of federalism. Sufficient discovery, even in the case of a project utilizing only a single workman, would reveal, for example, that he wore boots and overalls manufactured out-of-state; that he had bought them for his work, among other purposes; and, finally, that his work on the project, at least to some extent, caused wear and tear on the overalls and boots and thereby advanced the date when he would need to buy replacements, manufactured out-of-state. Every contract requires or consumes, at least partially, something that has composed at least a minuscule portion *770 of interstate commerce and necessitates, at least partially, a replacement that will compose at least a minuscule portion of interstate commerce. Every contract investigated by accurately aimed and methodically pursued discovery would meet the criterion of the any-effect rule urged by the dissents.
If this example be called absurd, a reduction to absurdity is a fair way to analyze any extreme or absolute rule. The dissents do not articulate any test to distinguish this example from the contracts they intend for their any-effect rule to include. Such a rule would eliminate the last constitutional constraints on Congressional interference in the economic lives of Americans and the public policies of the respective states.
HOOPER, Chief Justice (dissenting).
I must respectfully dissent. I find the majority opinion very disturbing, for several reasons: In its footnote 4, it lightly disregards the appellate rule for overruling precedent; it ignores a clear distinction recognized by the United States Supreme Court between commercial cases and noncommercial cases in the context of interstate commerce; it adopts a bulky and unworkable standard for determining contacts with interstate commerce; and it ignores the facts or diminishes the importance of certain facts in this case.
The rationale of the majority opinion is flawed in several respects. First, it is far from clear that the "substantial-effect" standard enunciated in United States v. Lopez, 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), was meant to apply to the parties in this case. The Supreme Court stated in Lopez that the proper test for determining whether Congress has the power to regulate an activity under the Commerce Clause involves an analysis of whether the regulated activity "substantially affects" interstate commerce. 514 U.S. at 559, 115 S.Ct. 1624. However, contrary to the majority's conclusion, the language of Lopez does not mandate a holding that the "substantial-effect" standard applies to this case. The majority states that the Lopez Court referred to the requirement of a substantial effect as generally applicable to the regulation of economic activity, and it concludes that "[t]hat broad reference, albeit dictum, does not suggest that the requirement of a substantial effect would not apply to the question whether a particular contract is subject to the FAA." 775 So.2d at 761. Had the authority of Congress to enact the FAA been subject to a Commerce Clause challenge, as the statute in Lopez was, the proper standard to use would be whether the legislation regulates economic activity that substantially affects interstate commerce. However, that is not the issue in the present case.
The issue is whether the FAA applies to preempt Alabama's statute prohibiting the enforcement of predispute agreements to arbitrate. Section 2 of the FAA provides, in pertinent part:
"A written provision in ... a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract... shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."
(Emphasis added.) Three months before it decided Lopez, the United States Supreme Court held, in Allied-Bruce Terminix Cos. v. Dobson, 513 U.S. 265, 273-74, 115 S.Ct. 834, 130 L.Ed.2d 753 (1995) ("Terminix"), that "the word `involving' is broad and is indeed the equivalent of `affecting.'" Thus, the Court held in Terminix that the FAA applies to "a contract evidencing a transaction involving [or affecting] commerce." 513 U.S. at 273-74, 115 S.Ct. 834. The United States Supreme Court has defined the terms "involving" and "affecting" in the broadest possible way. See Terminix, 513 U.S. at 273, 115 S.Ct. 834; Russell v. United States, 471 U.S. 858, 859, 105 S.Ct. 2455, 85 L.Ed.2d 829 (1985). Are we to assume *771 that in Lopez the Court forgot to overrule Terminix?
In contrast, Lopez involved a challenge to a criminal statute prohibiting the possession of a firearm in a school zone. The Supreme Court held that the Gun-Free School Zones Act of 1990 was beyond the scope of Congress's power under the Commerce Clause because the statute "neither regulates a commercial activity nor contains a requirement that the possession be connected in any way to interstate commerce." 514 U.S. at 551, 115 S.Ct. 1624 (emphasis added). Terminix[6] was decided by the Supreme Court a mere three months before it decided Lopez, yet Lopez made no mention of Terminix when it stated that an activity must "`substantially affect' interstate commerce in order to be within Congress' power to regulate it under the Commerce Clause." 514 U.S. at 559, 115 S.Ct. 1624.
Lopez involved a challenge to Congress's authority to pass a statute regulating the possession of guns in school zones. However, the constitutionality of the FAA, a federal statute, has not been challenged in this case. Even if the FAA had been challenged, this Court should find it distinguishable from the criminal statute challenged in Lopez. Unlike the statute involved in Lopez, the FAA contains a "requirement that the [contract] be connected... to interstate commerce."[7] 514 U.S. at 551, 115 S.Ct. 1624. The plain reading of § 2 of the FAA (9 U.S.C. § 2), as well as the Supreme Court's mandate in Terminix, indicates that the FAA preempts contrary state law when an arbitration provision exists in a contract "evidencing a transaction involving [or affecting] commerce."
This rationale was utilized by the Supreme Court of Texas in its recent decision in In re L & L Kempwood Associates, L.P., 9 S.W.3d 125 (Tex.1999), wherein the court stated:
"Kempwood argues that Lopez did not restrict [Terminix]. We agree. The Supreme Court held in [Terminix] that the provision of the Federal Arbitration Act that `makes enforceable a written arbitration provision in a "contract evidencing a transaction involving commerce"' extends to any contract affecting commerce, as far as the Commerce Clause of the United States Constitution will reach.... Lopez, decided April 26, 1995, did not cite [Terminix], decided January 18, 1995, or suggest in any way that it had changed its view of Congress's commerce power over economic activities. Lopez did not restrict the scope of the Federal Arbitration Act as construed in [Terminix]. The other courts to consider this issue of which we are aware have reached the same conclusion."
9 S.W.3d at 127 (footnotes omitted). I find it intriguing that the Texas Supreme Court cited the opinion in Hurst v. Tony Moore Imports, Inc., 699 So.2d 1249 (Ala.1997), as authority for the proposition that Lopez did not alter the United States Supreme Court's holding in Terminix. However, it seems that this Court no longer supports the view four Justices held in Hurst, although it has not provided any explanation for the turnaround.
*772 Hurst, written less than four years ago, examined numerous decisions of the United States Supreme Court involving interstate commerce. Four Justices stated in the Hurst opinion (with one Justice concurring in the result and four Justices dissenting):
"The Court's opinions discussing the reach of the Commerce Clause seem to hold that almost any commercial transaction undertaken may `affect' interstate commerce, no matter how slightly, and therefore can be regulated by Congress. [Those opinions] stand for the proposition that if any effect on interstate commerce can be found in a commercial transaction, then the transaction is considered to be one involving interstate commerce."
699 So.2d at 1257 (citations omitted). Hurst also distinguished the United States Supreme Court's decision in Lopez, stating: "[W]e do not view Lopez as signaling a retreat by the Supreme Court from its expansive interpretation of `interstate commerce' in cases clearly involving commercial transactions." 699 So.2d at 1257.
In fact, the United States Supreme Court has often given an expansive interpretation to Congress's regulatory power under the Commerce Clause in commercial settings, as opposed to the more limited interpretation given in noncommercial settings, as evidenced by Lopez. Two examples are Wickard v. Filburn, 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942) (holding that a farmer's eating food produced from wheat he had grown on his own land would substantially affect interstate commerce because the result would be that he would buy less wheat on the market), and Russell v. United States, 471 U.S. 858, 105 S.Ct. 2455, 85 L.Ed.2d 829 (1985) (holding that the rental of a two-unit apartment building in Illinois affects interstate commerce and is subject to congressional regulation under the Commerce Clause because the local rental of an apartment unit is an element of a broader commercial market of rental properties).
This Court, in Delta Construction Corp. v. Gooden, 714 So.2d 975, 978 (1998), noted that in Hurst four Justices had "explained that United States Supreme Court precedent indicates that even an intrastate transaction `involves' interstate commerce if it has virtually any tangible effect on the generation of goods or services for interstate markets and their distribution to the consumer." (Emphasis added.) Hurst had used slightly different language, stating that "a purely intrastate transaction, such as the one here, must affect in some way `the generation of goods and services for interstate markets and their transport and distribution for the consumer' in order for it to `involve' interstate commerce within the meaning of § 2 of the FAA." 699 So.2d at 1255 (citation omitted) (emphasis added). It is curious that just one year after deciding Delta Construction even though the Hurst opinion had used the words "affect in some way" and even though the Court in Delta Construction had suggested that "United States Supreme Court precedent" recognizes that "an intrastate transaction `involves' interstate commerce if it has virtually any tangible effect on the generation of goods and services for interstate markets" (emphasis added)the Court cited Hurst and Delta Construction as authority for this statement: "This Court has held that even an intrastate transaction `involves' interstate commerce if it has a substantial effect on the generation of goods or services for interstate markets and their distribution to the consumer." Southern United Fire Ins. Co. v. Knight, 736 So.2d 582, 586 (Ala.1999). In fact, until it decided Knight, this Court had never used the words "substantial effect" in that context.
Thus, in the past year, this Court has abandoned its own expansive interpretation of "interstate commerce," and that of the United States Supreme Court, by determining that "[t]o satisfy the interstate-commerce criterion, the involvement of, or effect on, interstate commerce must be substantial." Rogers Foundation Repair, Inc. v. Powell, 748 So.2d 869, 871 (Ala. *773 1999); see also Knight, supra. This Court has apparently determined, without explanation, that its previous decisions were incorrect and that the standard enunciated to strike down a criminal statute in Lopez is now applicable to commercial cases governed by the FAA.[8] I dissented in Knight. I concurred with the opinion in Powell, not recognizing the subtle change in language that had been inserted into that opinion (adopted from Knight) without explanation. That case was, nevertheless, correctly decided because that case involved a transaction with virtually no effect on interstate commerce. Powell involved a contract between the Powells, who were Alabama residents, and Rogers Foundation Repair, Inc., an Alabama corporation, for the repair of the Powells' chimney. The two persons employed by Rogers to do the repair work were also Alabama residents. The only equipment used during the project was a shovel. No materials were used for the project, and no evidence in the record indicated that the shovel or anything else pertaining to the project had traveled in interstate commerce. As discussed later in this dissent, the contract between Cochran and the Sisters evidences a transaction that had a much greater effect on interstate commerce than the effect of the contract in Powell.
It seems that the sudden embrace of the requirement that a transaction "substantially affect" interstate commerce in order for the FAA to apply was a somewhat careless move and is contrary to the doctrine of stare decisis. The United States Supreme Court examined the doctrine of stare decisis in Planned Parenthood of Southeastern Pennsylvania v. Casey, 505 U.S. 833, 854-55, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992), setting forth four instances when it is appropriate to overrule precedent:
"The obligation to follow precedent begins with necessity, and a contrary necessity marks its outer limit. With Cardozo, we recognize that no judicial system could do society's work if it eyed each issue afresh in every case that raised it. Indeed, the very concept of the rule of law underlying our own Constitution requires such continuity over time that a respect for precedent is, by definition, indispensable. At the other extreme, a different necessity would make itself felt if a prior judicial ruling should come to be seen so clearly as error that its enforcement was for that very reason doomed.
"Even when the decision to overrule a prior case is not, as in the rare, latter instance, virtually foreordained, it is common wisdom that the rule of stare decisis is not an `inexorable command,' and certainly it is not such in every constitutional case. Rather, when this Court reexamines a prior holding, its judgment is customarily informed by a series of prudential and pragmatic considerations designed to test the consistency of overruling a prior decision with the ideal of the rule of law, and to gauge the respective costs of reaffirming and overruling a prior case. Thus, for example, we may ask whether the rule has proven to be intolerable simply in defying practical workability; whether the rule is subject to a kind of reliance that would lend a special hardship to the consequences of overruling and add inequity to the cost of repudiation; whether related principles of law have so far developed as to have left the old rule no more than a remnant of abandoned doctrine; or whether facts have so changed, or come to be seen so differently, as to have robbed the old rule of significant application or justification."
(Citations omitted.)
This statement from Planned Parent-hood would obviously require a rigorous *774 analysis of prior precedent and the proposed new standard before a State's highest court could legitimately adopt the new standard. As Chief Justice, I am compelled to point out that no such analysis by this Court has occurred with respect to the change from the "virtually any tangible effect" language of Delta Construction, 714 So.2d at 978 to the "substantially affect" language. Such a neglect as that is intolerable in the decisions of a State's highest court.
None of the four situations stated by the Supreme Court in Planned Parenthood is applicable to justify the blatant disregard of precedent in the present case. Hurst did not interpret the Supreme Court's decision in Lopez as "signaling a retreat by the Supreme Court from its expansive interpretation of `interstate commerce' in cases clearly involving commercial transactions." 699 So.2d at 1257. Hurst was released in July 1997, and there has been no suggestion that its rationale is unworkable. Certainly, in such a short time the rule could not be considered a "remnant of abandoned doctrine," nor have facts so changed as to "rob[] the old rule of significant application or justification." Planned Parenthood, 505 U.S. at 855, 112 S.Ct. 2791. In fact, the rule enunciated in Hurst has been explicitly embraced by at least one other State supreme court. See In re L & L Kempwood Associates, L.P., supra.
Finally, the rule enunciated in Hurst is just the kind of rule upon which people rely when entering into contracts; it is a rule "subject to a kind of reliance that would lend a special hardship to the consequences of overruling." 505 U.S. at 854, 112 S.Ct. 2791. The Sisters relied on the Hurst rule and believed that they were permitted to arbitrate with Cochran any dispute arising pursuant to their contract, as long as the transaction between them "involved" or "affected" interstate commerce. Now that they have a claim against Cochran, today's majority denies the Sisters the opportunity to arbitrate, a right they specifically contracted for; it denies them that opportunity by ignoring precedent and creating a stricter standard for enforcing arbitration provisions. Such a change threatens the very purpose of the doctrine of stare decisisstability and predictability for the ordering of citizens' lives and businesses' transactions.
The value of stare decisis was aptly explained long ago by this Court in Lindsay v. United States Savings & Loan Ass'n, 120 Ala. 156, 167, 24 So. 171, 174 (1898):
"`If a decision has been made upon solemn and mature consideration, the presumption is in favor of its correctness, and the community have a right to regard it as a just declaration or exposition of the law, and to regulate their actions by it. It would, therefore, be extremely inconvenient to the public if precedents were not duly regarded and implicitly followed.' And further: `When a rule has once been deliberately adopted and declared, it ought not to be disturbed unless by a court of appeal or review, and never by the same court, except for very urgent reasons, and upon a clear manifestation of error; and, if the practice were otherwise, it would be leaving us in a perplexing uncertainty as to the law.'"
(Quoting Chancellor Kent.) In this case, there has been no showing that the rule of law stated in Hurst, which is supported by United States Supreme Court caselaw, and which was faithfully followed until recently, was in error. Nor has there been shown any reason, much less an urgent reason, to overturn that rule.
The second flaw in the majority opinion is its examination of Wickard and its "primary-purpose" analysis. In Wickard, the United States Supreme Court stated that one of the primary purposes of the Act in question was to increase the market price of wheat and to limit the volume of wheat that could affect the market. Therefore, the Court concluded, one individual's home-consumption of wheat would have a substantial influence on price and market *775 conditions when that individual activity was "taken together with that of many others similarly situated." 317 U.S. at 128, 63 S.Ct. 82. Failing to apply the regulation to that individual, who seemingly had only a trivial and indirect effect on interstate commerce, would in fact have frustrated the primary purpose of the Act. Thus, according to the majority opinion in this present case, whether a federal regulation should apply to an individual turns on the question whether exempting that individual, and all others similarly situated, would defeat the "primary purpose" of the Act. The United States Supreme Court has stated that "the basic purpose of the Federal Arbitration Act is to overcome courts' refusals to enforce agreements to arbitrate." Terminix, 513 U.S. at 270, 115 S.Ct. 834 (acknowledging that in examining the FAA, the Court was "interpreting an Act that seeks broadly to overcome judicial hostility to arbitration agreements," 513 U.S. at 272, 115 S.Ct. 834.). The majority is today in fact frustrating the basic purpose of the FAA by refusing to enforce an agreement to arbitrate that is contained in a contract evidencing a transaction involving commerce. The Court's failure to enforce the arbitration contract between the Sisters and Cochran, as well as contracts of all those similarly situated, is not only a defeat of the primary purpose of the FAA, but is precisely the reason why the FAA was adopted in the first place.[9]
The next flaw in the majority opinion is its attempt to create a "test for determining whether a particular contract has a substantial effect on interstate commerce." 775 So.2d at 764. While I laud the effort to create a test for determining whether a transaction has the requisite effect on interstate commerce to invoke the FAA, the standard that has been created by the majority today will do more harm than good. The standard is arbitrarily constructed and arbitrarily applied in order to reach the desired result. Instead of relying on precedent and comparing previous cases to the one at bar, the majority opinion has created a hypothetical transaction and concocted five elements for determining whether this hypothetical transaction substantially affects interstate commerce. The opinion then applies those elements to the case at bar to determine that the Sisters have failed to prove that the contract with Cochran substantially affects interstate commerce. It is not clear whether a party is required to satisfy all five of the elements, three out of five elements, or some other number of elements in order to satisfy the test. The standard described by the majority opinion effectively limits the plenary power of Congress and creates a higher burden for parties to satisfy in order to enforce arbitration agreements. This result directly contradicts the federal policy favoring arbitration and the "primary purpose" of the FAA.
In addition to creating an unworkable standard, the majority opinion fails to properly apply the elements of its own test to the facts of this case. Without lending my approval to the standard enunciated in the majority opinion, I submit that the present case nevertheless satisfies the majority's test.

I. Citizenship of the Parties
Neither party has disputed that the parties to this case are both Alabama residents, nor have they claimed any affiliation with out-of-state entities.[10] However, I *776 think it is important not to discount the citizenship of other parties that are involved in the contract between the Sisters and Cochran. These parties are discussed more thoroughly in Part III of this dissent, but they include the preservation consultant from Texas, who traveled to Alabama to meet with Cochran and to prepare the specifications for the plaster work; the painting company, whose artists were predominantly from out of state, and who had to repair the damage caused by Cochran's allegedly negligent plaster work; and the out-of-state insurance company from whom Cochran obtained liability insurance for the. project, pursuant to its contract with the Sisters.

II. Tools and Equipment
The majority opinion has included "tools and equipment" as an element in its test, even though neither party has asserted that Cochran acquired tools or equipment in interstate commerce for performance of this contract. Nevertheless, the majority does mention the scaffolding used by Cochran as well as by other contractors; the Sisters rented this scaffolding from a supplier headquartered in Missouri, with an office in Mobile. While not strictly an element of the contract solely between the Sisters and Cochran, Cochran's use of the scaffolding rented by the Sisters for use during the entire renovation project demonstrates that the separate contractors, including Cochran, are not necessarily entirely separable from the whole renovation project. This is addressed further in Part V.

III. Allocation of Cost of Services and Materials
It is this category into which the majority lumps most of the interstate contacts that are present in this transaction. The manufacturer and supplier of the washers used by Cochran in pinning up loose moldings is located in Massachusetts. The preservation consultant who prepared the plaster specifications for Cochran traveled from Texas to work on the project. Cochran obtained liability insurance for the project through an out-of-state company. The majority proceeds to diminish the importance of these interstate contacts by creating an arbitrary allocation standard that appears to provide that a party who wants to enforce an arbitration agreement must prove that more than half of the money paid under the contract went toward out-of-state services and materials. This case involves a business agreement, a commercial transaction, in which an entity engaged the services of a company to do repair work. Must we now require a party to a contract with an arbitration provision to keep an accounting of how much money paid under the contract is attributable to out-of-state supplies and services, in case the other party refuses to comply with the arbitration provision? Does a transaction have the requisite effect on interstate commerce only if more than half of the money paid under the contract is attributable to out-of-state supplies and services? If so, then consider a $10-million transaction between two Alabama companies. If 40% of the money paid under the contract is attributable to out-of-state services and materials brought into *777 the State, does the transaction fail to affect interstate commerce, even though $4 million worth of supplies and services are moving in interstate commerce? Even this one element alone will likely attract the attention of the United States Supreme Court.
In addition, the majority simply glosses over the fact that, pursuant to their contracts, the Sisters required each of their contractors to carry insurance coverage during the project. Cochran obtained its insurance through an out-of-state insurance company, and its policy named Hall Baumhauer, the architect, and Tom P. Ollinger Construction, Inc., as additional insureds, indicating that the policy was obtained specifically for this project. This Court and the United States Supreme Court have held that out-of-state insurance contracts clearly implicate interstate commerce: "Unquestionably, insurance transactions that stretch across state lines or intrastate insurance transactions that otherwise have the requisite (substantial) effect on interstate commerce constitute `Commerce among the several States,' so as to make them subject to regulation by Congress under the Commerce Clause of the United States Constitution." Knight, 736 So.2d at 586. The United States Supreme Court has held that "an insurance company doing business across state lines engages in interstate commerce." See Humana Inc. v. Forsyth, 525 U.S. 299, 306, 119 S.Ct. 710, 142 L.Ed.2d 753 (1999) (discussing United States v. South-Eastern Underwriters Ass'n, 322 U.S. 533, 64 S.Ct. 1162, 88 L.Ed. 1440 (1944)). This Court held in Fidelity National Title Insurance Co. of Tennessee v. Jericho Management, Inc., 722 So.2d 740 (Ala.1998), that a title insurance policy issued by a Tennessee corporation that protects an Alabama corporation's mortgage, in connection with a federally regulated loan transaction, sufficiently affected interstate commerce to invoke the FAA. Despite the precedent to the contrary, the majority in the present case simply overlooks the insurance policy obtained by Cochran from an out-of-state company.

IV. Subsequent Movement Across State Lines
The majority has determined that because Cochran's work deals with a structure that cannot be detached and moved across state lines, Cochran's work will not have a subsequent effect on interstate commerce. However, if we are to consider movement across state lines that occurs after a contract has been performed, then this transaction certainly is one that affects interstate commerce. Assuming for the moment that the Sisters' allegations of negligence by Cochran are true, Cochran's negligence directly involved and affected the provision of goods and services in interstate commerce in that it necessitated the complete repainting of entire sections of the chapel walls and ceiling by artists who had to be brought into Alabama from other States to repair the damage Cochran caused. Thus, Cochran's negligence in the performance of its contract directly affected other aspects of the project and involved or affected interstate commerce because of the necessity for subsequent transactions involving movement across State lines.

V. Degree of Separability From Other Contracts
The renovation of the Sisters' chapel was a project involving several contractors. Cochran did not perform an isolated piece of work; its work was part of a joint effort of several subcontractors. Therefore, the work of each one was related to and dependent upon the work of all the others. Considering the degree to which the work done by the several contractors in this renovation project was intermingled, we should not simply extract Cochran from the coordinated actions necessary for the success of the entire project and say that its contract does not affect interstate commerce. In addition to contracting with Cochran to provide the plaster work, the Sisters engaged Hall Baumhauer, an Alabama company, to provide the architectural *778 and consulting services for the restoration project. Hall Baumhauer contracted with Greg Free, a resident of Texas, to provide preservation consulting services, including the drafting of specifications for the plaster work. Free traveled to Mobile from Texas during the course of the renovations, and Free met specifically with Cochran and provided consulting services regarding the plaster work. The Sisters rented scaffolding, which was used by Cochran and other contractors, from a supplier headquartered in Missouri and with an office in Mobile.
Canning, an entity organized and located in Connecticut, was hired to restore the ornamental paintings on the plaster walls and ceiling of the chapel. This is relevant to Cochran's contract in two respects. First, the entire dispute between the Sisters and Cochran relates to the fact that, in choosing a particular method of plaster repair, Cochran believed that the entire ceiling of the chapel would be repainted. Instead, the Sisters planned to repaint only the repaired sections. Cochran claims that it would have chosen a different method of plaster repair had it known that only the repaired portions of the chapel would be repainted. The Sisters' contract with Cochran and their contract with Canning were therefore interrelated.
Second, after Cochran allegedly performed its plaster work negligently, the Sisters had to further engage the services of Canning, at an increased cost, which included payment for more work and for interstate travel, in order to repair the damage, because entire sections of the ornamental paintings had to be repainted rather than repaired. All of the artists employed by Canning, except one, reside outside Alabama and traveled to Alabama on numerous occasions during the course of the project and after Cochran had completed its work.
The majority states that "we should not hold that proximity of this particular contract to contracts substantially affecting interstate commerce is determinative, lest we err by expanding the Commerce Clause." 775 So.2d at 767. However, the United States Supreme Court has, since 1824, held that "Congress' authority under the Commerce Clause [is] plenary." Southland, 465 U.S. at 11, 104 S.Ct. 852. The phrase "involving commerce," as it is used in § 2 of the FAA, has been held to be the functional equivalent of the phrase "affecting commerce," and the Supreme Court has noted that "[t]hat phrase`affecting commerce'normally signals Congress' intent to exercise its Commerce Clause powers to the full." Terminix, 513 U.S. at 273, 115 S.Ct. 834. This Court need not unilaterally "expand" the Commerce Clause; however, it should follow the precedent of the United States Supreme Court with respect to the interpretation of the Commerce Clause. The Supreme Court stated in Terminix, regarding an analysis of the language of § 2 of the FAA:
"[A] broad interpretation of this language [`involving commerce'] is consistent with the Act's basic purpose, to put arbitration provisions `"on the same footing"' as a contract's other terms. Conversely, a narrower interpretation is not consistent with the Act's purpose, for (unless unreasonably narrowed to the flow of commerce) such an interpretation would create a new, unfamiliar test lying somewhere in a no man's land between `in commerce' and `affecting commerce,' thereby unnecessarily complicating the law and breeding litigation from a statute that seeks to avoid it."
513 U.S. at 275, 115 S.Ct. 834 (citations omitted). The majority opinion has created exactly what the Supreme Court in Terminix sought to avoidan "unfamiliar test lying somewhere in a no man's land between `in commerce' and `affecting commerce,'" a test that will "breed[] litigation from a statute that seeks to avoid it." 513 U.S. at 275, 115 S.Ct. 834.
By enacting § 2 of the FAA, "Congress declared a national policy favoring arbitration and withdrew the power of the states *779 to require a judicial forum for the resolution of claims which the contracting parties agreed to resolve by arbitration." Southland Corp. v. Keating, 465 U.S. 1, 10, 104 S.Ct. 852, 79 L.Ed.2d 1 (1984). The United States Supreme Court set out the limitations of the FAA in Southland:
"We discern only two limitations on the enforceability of arbitration provisions governed by the Federal Arbitration Act: they must be part of a written maritime contract or a contract `evidencing a transaction involving commerce' and such clauses may be revoked upon `grounds as exist at law or in equity for the revocation of any contract.' We see nothing in the Act indicating that the broad principle of enforceability is subject to any additional limitations under state law."
465 U.S. at 10-11, 104 S.Ct. 852.
However, in the present case, this Court has seen fit to provide its own additional limitations under Alabama law, in the form of a five-part standard, which has no basis in precedent. When viewed in the aggregate, Cochran's use of materials procured by a local supplier from out-of-state, Cochran's following the plaster specifications prepared by an out-of-state consultant, and Cochran's use of an out-of-state insurance company in connection with the restoration project are facts that indicate this transaction had more than the requisite effect on interstate commerce for the FAA to apply. See Wickard, 317 U.S. at 128, 63 S.Ct. 82 (holding that effects on interstate commerce can be considered in the aggregate in determining whether federal regulations apply to an individual). In addition, the relationship of Cochran's contract to the whole of the renovation project makes it difficult to discount the effects Cochran's work had on the entire restoration project.
As authority for its narrow interpretation of the FAA, the majority opinion twice quotes NLRB v. Jones & Laughlin Steel Corp., 301 U.S. at 37,, 57 S.Ct. 615, for the proposition that the commerce power should not be extended so far as to "`effectually obliterate the distinction between what is national and what is local and create a completely centralized government.'" 775 So.2d at 763. However, while presenting this warning as to the scope of the interstate-commerce power, the Court in Jones & Laughlin Steel expanded the commerce power by upholding "the National Labor Relations Act against a Commerce Clause challenge, and in the process, depart[ing] from the distinction between `direct' and `indirect' effects on interstate commerce." Lopez, 514 U.S. at 555, 115 S.Ct. 1624. Thus, I am not persuaded that Jones & Laughlin Steel is good authority for limiting the scope of the commerce power in the present case.
For these reasons, I am bound by the doctrine of stare decisis and, under the principles previously enunciated by this Court and the United States Supreme Court, I conclude that the Sisters have proved that their contract with Cochran has the requisite effect on interstate commerce for enforcement of the arbitration provision, pursuant to the FAA. Therefore, I would hold that the FAA does apply to preempt § 8-1-41(3), Ala.Code 1975, and to render the arbitration agreement between the Sisters and Cochran enforceable.
MADDOX, Justice (dissenting).
I must respectfully disagree with the majority's conclusion that the Federal Arbitration Act (FAA) does not apply to the transaction in this case. The majority, in reaching its conclusion, states that the FAA does not apply, for the following reason:
"The Sisters have not proven that the transaction substantially affects interstate commerce and, therefore, the contrary rule of the FAA does not displace Ala.Code 1975, § 8-1-41(3), prohibiting the specific enforcement of a predispute arbitration agreement."
775 So.2d at 767.
The majority relies on United States v. Lopez, 514 U.S. 549, 115 S.Ct. 1624, 131 *780 L.Ed.2d 626 (1995), a case in which the Supreme Court of the United States held that the Gun-Free School Zones Act, which made it a federal offense for a person knowingly to possess a firearm at a place that the person knew or had reasonable cause to believe was a school zone, exceeded Congress's Commerce Clause authority, because possession of a gun in a local school zone was not economic activity that substantially affected interstate commerce. I believe the majority's reliance on Lopez is misplaced.
Although the Lopez case and this case both involve a question regarding Congress's power under the Commerce Clause, this case involves the FAA, and the question in this case is not whether Congress had the power to pass the FAA, but what Congress intended when it did so. I believe that the Supreme Court of the United States addressed and settled that question in Allied-Bruce Terminix Cos. v. Dobson, 513 U.S. 265, 115 S.Ct. 834, 130 L.Ed.2d 753 (1995), in which the Court set out the proper test to be applied in cases involving the application of the FAA. In construing the scope of the FAA, the Court addressed the question what commercial activity would be included within the coverage of the FAA's provisions, and it concluded that the wording used by Congress "signals an intent to exercise Congress' commerce power to the full." 513 U.S. at 277, 115 S.Ct. 834. (Emphasis added.) With all due respect to the majority in the present case, I note that it appears to me that the majority opinion fails to apply the law of arbitration as that law is set out in the Allied-Bruce Terminix case and that it fails to apply the policy of the Federal Government favoring arbitration "to the full."
When Allied-Bruce Terminix was decided, I thought most questions regarding the law of arbitration had been put to rest, and I fear that the result reached by the Court in this present case will only exacerbate the dispute between parties regarding whether the FAA should apply. I also thought that the Supreme Court of the United States, in an earlier appeal in an Alabama case involving the FAA, had also settled the debate. In Ex parte Alabama Oxygen Co., 433 So.2d 1158 (Ala.1983), this Court was faced with the issue that is presented here: Did the FAA control? In that earlier case, a majority of this Court refused to apply the FAA in a State court proceeding. The Supreme Court of the United States reversed the judgment of this Court.[11] It held that the FAA applied to state actions. After a remand from the United States Supreme Court, this Court, in Ex parte Alabama Oxygen Co., 452 So.2d 860 (Ala.1984), acknowledged that the FAA applied to cases brought in the courts of this State, and it approved the views I had expressed in a dissent from the original opinion in Ex parte Alabama Oxygen. In that dissent I had said, in part, that "[t]he Federal Arbitration Act (9 U.S.C. § 2 (1976)) creates a federal right to specific enforcement of arbitration agreements which are a part of contracts involving interstate commerce, notwithstanding any state substantive or procedural policies to the contrary." Ex parte Alabama Oxygen Co., 433 So.2d at 1168 (Maddox, J. dissenting).
After the Supreme Court reversed the judgment of this Court in Ex parte Alabama Oxygen, this Court followed what, in my opinion, was the correct rule, which was generally referred to as the "slightest-nexus" test. The slightest-nexus test was adopted by this Court in Ex parte Costa & Head (Atrium), Ltd., 486 So.2d 1272 (Ala. 1986):
"The requirement of the FAA that an arbitration agreement `involve commerce' has been construed very broadly so that the slightest nexus of the agreement with interstate commerce will bring the agreement within the ambit of the FAA. See Snyder v. Smith, 736 F.2d 409 (7th Cir.1984), cert. denied, 469 U.S. *781 1037, 105 S.Ct. 513, 83 L.Ed.2d 403 (1984)."
486 So.2d at 1275. (Emphasis added.)
Only a few years after it had decided Costa & Head, however, this Court specifically rejected the slightest-nexus test, in Ex parte Warren, 548 So.2d 157 (Ala. 1989), a case in which I dissented. In the Warren case, a majority of this Court adopted the so-called "contemplation-of-substantial-interstate-activity test," which established the following standard for determining whether the FAA applied to a given transaction: "`[W]hether at the time [the parties] entered into [the contract] and accepted the arbitration clause, they contemplated substantial interstate activity.'" 548 So.2d at 160 (quoting Metro Indus. Painting Corp. v. Terminal Constr. Co., 287 F.2d 382, 387 (2d Cir.1961) (emphasis in Metro Indus. Painting), cert. denied, 368 U.S. 817, 82 S.Ct. 31, 7 L.Ed.2d 24 (1961)).[12]
This Court has been inconsistent in its application of what I consider to be the proper standard, and I think the Court is again departing from the standard set by the Supreme Court in cases dealing with an interpretation of the words "involving commerce," as those words are used in the FAA. My position has been consistent throughout, and, based upon my understanding of the opinions of the Supreme Court of the United States interpreting the scope of the FAA, I continue to believe that the slightest-nexus test that this Court established in Ex parte Costa & Head (Atrium), Ltd.,but later discarded in Ex parte Warrenis consistent with the test set out in Allied-Bruce Terminix and should be the test applied in the present case. Stated differently, I believe the test adopted by the majority today is essentially a restatement of the so-called "contemplation" test set out in Ex parte Warren, 548 So.2d 157 (Ala.), cert. denied sub nom. Jim Skinner Ford, Inc. v. Warren, 493 U.S. 998, 110 S.Ct. 554, 107 L.Ed.2d 550 (1989), a test that was specifically rejected in Allied-Bruce Terminix, supra, and in the later case of Home Buyers Warranty Corp. II v. Lopez, 513 U.S. 1123, 115 S.Ct. 930, 130 L.Ed.2d 876 (1995), another case that was appealed from this Court.[13]
*782 Based on my understanding of the law of arbitration as expressed by the Supreme Court of the United States in Allied-Bruce Terminix, the so-called "contemplation" test, or any semblance of it, such as the "substantial-effect-on-interstate-commerce" test that the Court applies today, is not the proper test to be applied, because it has been specifically rejected by the Supreme Court in cases appealed to that Court from this Court, and I conclude this dissenting opinion by suggesting that it appears to me that the majority is considering the wrong Lopez case in reaching its conclusion in this case. It should be following the Lopez case that interprets the FAA,[14] rather than the standard stated in the Lopez case that declared a federal penal law unconstitutional as being beyond the scope of Congressional power.[15]
SEE, Justice (dissenting).
I agree with both Chief Justice Hooper and Justice Maddox that the majority opinion incorrectly extends United States v. Lopez, 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995). The majority requires that an individual transaction "substantially affect" interstate commerce before it can be subject to the Federal Arbitration Act (the "FAA"). The majority also establishes a higher standard of "substantial effect" than is permitted under existing United States Supreme Court precedent. See Wickard v. Filburn, 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942). The United States Supreme Court has held that in the FAA Congress exercised the full scope of its Commerce Clause power. See Allied-Bruce Terminix Cos. v. Dobson, 513 U.S. 265, 277, 115 S.Ct. 834, 130 L.Ed.2d 753 (1995). Until the United States Supreme Court overrules Wickard, Congress may constitutionally subject to federal jurisdiction economic activity that affects interstate commerce, as long as that effect is substantial when considered in the aggregate. I, therefore, respectfully dissent.

On Application for Rehearing
LYONS, Justice.
APPLICATION OVERRULED.
*783 HOUSTON, COOK, BROWN, JOHNSTONE, and ENGLAND, JJ., concur.
HOOPER, C.J., and MADDOX and SEE, JJ., dissent.
HOOPER, Chief Justice (dissenting).
I must respectfully dissent. In its original opinion, this Court purported to create a new standard for determining whether a transaction has a sufficient effect on interstate commerce to be subject to the Federal Arbitration Act. This Court set forth five specific elements, which it had never before imposed, as requirements for proof of a "substantial effect" on interstate commerce. On application for rehearing, the Sisters have requested the opportunity to comply with the test announced under this newly established doctrine.
If this Court is going to establish a new standard for determining the applicability of the FAA, then it should either apply this standard prospectively only, or else give the Sisters the opportunity to demonstrate that their contract with Cochran meets this newly established standard. I would grant the application for rehearing.
NOTES
[1] See Edmond Seferi, FAA and Arbitration ClausesHow Far Can It Reach? The Effect of Allied-Bruce Terminix, Inc. v. Dobson, 19 Campbell L.Rev. 607, 617 (1997).
[2] The Gun-Free School Zones Act, 18 U.S.C. § 922(q)(2)(A) (1988), made it a federal crime "for any individual knowingly to possess a firearm that has moved in or that otherwise affects interstate or foreign commerce at a place that the individual knows, or has reasonable cause to believe, is a school zone."
[3] Justice Maddox, in his dissent, says we have followed the wrong Lopez case. In Home Buyers Warranty Corp. II v. Lopez, 513 U.S. 1123, 115 S.Ct. 930, 130 L.Ed.2d 876 (1995), cited by Justice Maddox, the United States Supreme Court vacated this Court's judgment in Lopez v. Home Buyers Warranty Corp., 628 So.2d 361 (Ala.1993), stating only that it remanded the case "for further consideration in light of Allied-Bruce Terminix Cos. v. Dobson." However, in Lopez v. Home Buyers Warranty Corp., this Court had examined the contemplation of the parties at the time they executed the contract as to whether that contract would involve interstate commerce. In Terminix, the Supreme Court expressly repudiated an interpretation of Congressional authority based on the contemplation of the parties to a contract, in favor of a "commerce-infact" interpretation, i.e., an interpretation that Congress has, under the Commerce Clause, the power to regulate a contract if the transaction to which the contract related in fact involved (affected) interstate commerce. 513 U.S. at 281, 115 S.Ct. 834. It appears that the dissent attaches significance to the remand in Home Buyers Warranty Corp. II v. Lopez for the wrong reason.
[4] The opinion in Hurst v. Tony Moore Imports, Inc., 699 So.2d 1249 (Ala.1997) (four Justices concurring and one Justice concurring in the result), declined to read Lopez's analysis as applicable to cases involving commercial transactions; a conclusion that the Lopez analysis is not applicable to such cases cannot be squared with the broad language used in Lopez. Because we are dealing with the scope of the power conferred on Congress by the Commerce Clause (and because, under Article VI of the United States Constitution, we must recognize that scope), we decline to disregard the clear dictum in Lopez.

The Chief Justice, in his dissent, concludes that we have overruled Delta Construction Corp. v. Gooden, 714 So.2d 975 (Ala.1998), and then views this Court's efforts to grasp the trend of the United States Supreme Court's cases on the reach of the Commerce Clause as governed by principles applicable to the implications attendant to overruling Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), the seminal abortion-rights case. See dissenting opinion of Chief Justice Hooper, infra, at 773, citing Planned Parenthood of Southeastern Pennsylvania v. Casey, 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992). First, in Delta Construction, this Court, in face of evidence indicating that the contract involved had a substantial effect on interstate commerce (more than half of the contractor's orders for materials, equipment, and supplies were obtained from out of state, and the contractor's work crews were brought from outside the state), merely noted that four Justices in Hurst had embraced the view that an intrastate transaction involves interstate commerce if it has "virtually any tangible effect on the generation of goods or services for interstate markets and their distribution to the consumer." 714 So.2d at 978 (citing Hurst, 699 So.2d at 1255, 1257). Consequently, principles of stare decisis are not relevant. Nonetheless, even if today we are considered to have overruled Delta Construction because it simply referred to the conclusion of four Justices in Hurst, the circumstances surrounding the question whether to overrule Roe v. Wade vastly differ in kind as well as degree from the circumstances surrounding the matter before us today. Suffice it to say that the excessive caution urged in the Chief Justice's dissent overlooks our responsibilities as judges of a State court under Art. VI of the Constitution of the United States.
[5] This analysis is necessarily fact-intensive and, in some respects, frustrates the laudable goal of summary and speedy disposition of the issue of arbitrability described as a component of the FAA in Terminix, 513 U.S. at 278, 115 S.Ct. 834. However, the goal of expediency cannot justify a court's disregarding constitutional limitations on the exercise of Congressional power. Moreover, it cannot be said that Congress was motivated by the goal of expediency when it created a right to trial by jury in disputes involving questions of arbitrability. See 9 U.S.C. § 4.
[6] In Terminix, the Supreme Court reversed a decision by this very Court, which had improperly limited the application of the FAA.
[7] The majority opinion, in its footnote 2, cites the Gun-Free School Zones Act as 18 U.S.C. § 922(q)(2)(A) (1988). That section does appear to reference interstate commerce, by requiring that the individual knowingly "possess a firearm that has moved in or that otherwise affects interstate or foreign commerce at a place that the individual knows, or has reasonable cause to believe, is a school zone."

However, in Lopez, the Supreme Court cited the Gun-Free School Zones Act as 18 U.S.C. § 922(q)(1)(A) (1988 ed., Supp. V). That section makes no reference to interstate commerce; that section makes it "a federal offense `for any individual knowingly to possess a firearm at a place that the individual knows, or has reasonable cause to believe, is a school zone.'" 514 U.S. at 551, 115 S.Ct. 1624.
[8] The only explanation given by the majority opinion comes in footnote 4, wherein the Court states that the conclusion in Hurst that the Lopez analysis was not applicable to cases involving commercial transactions "cannot be squared with the broad language used in Lopez" and that it "decline[s] to disregard the clear dictum in Lopez." 775 So.2d at 762 n. 4. I interpret Lopez very differently. Clear dictum indeed.
[9] The majority states that "Alabama has a robust alternative-dispute-resolution program." 775 So.2d at 764. That fact is wholly irrelevant to the present case. The Sisters specifically contracted for arbitration and should not be forced into protracted litigation in the hopes that a trial court might recommend the parties proceed to mediation, solely to support Alabama's freedom to try alternatives. It is likely that a long and protracted dispute in the courts is exactly what the Sisters sought to avoid when they contracted to arbitrate.
[10] However, the majority has found it necessary to state that "[t]he only affiliation of any of the parties with out-of-state entities is found in the relationship between the Sisters and the Roman Catholic Church." 775 So.2d at 765. This fact distinguishes the parties in this case from those in Terminix. Otherwise, it is my opinion that the transaction in this case has more contacts with interstate commerce than the transaction at issue in Terminix. I agree that the institutional relationship between the Sisters and the worldwide apparatus of the Roman Catholic Church would not normally touch upon interstate commerce. But neither would a transaction between a local Terminix franchise and an Alabama customer. Yet a commercial transaction in which an out-of-state portion of the Roman Catholic Church was involved would certainly affect interstate commerce. No evidence of the involvement of an out-of-state component of the Roman Catholic Church was presented by the Sisters. The facts of each case stand on their own merits.

I point out the above to explain that the mere religious nature of the Sisters organization and the institution of which it is a member is not relevant to the issue in this case and that I do not understand why the majority opinion highlighted the religious nature of the Roman Catholic Church.
[11] York Int'l v. Alabama Oxygen Co., 465 U.S. 1016, 104 S.Ct. 1260, 79 L.Ed.2d 668 (1984).
[12] This Court's decision in Ex parte Warren, which adopted a test requiring a showing that the parties "contemplated substantial interstate activity," was criticized as "creating a double standard." Stanley D. Bynum & J. David Pugh, Enforcing Arbitration Agreements in Alabama: A Double Standard Dilemma, 54 Ala. Law. 38, 43 (January 1993). Bynum and Pugh wrote that Costa & Head "brought Alabama law generally in line with the majority of other jurisdictions" but that Warren "is inconsistent with all other jurisdictions that have addressed the issue." Id. at 38-39, 41. The authors particularly criticized Warren's contemplation test for its subjectivity. Id. at 43.

A reading of this Court's decisions in arbitration cases following the adoption of the contemplation-of-substantial-interstate-activity test illustrates the subjectivity of the new test. For example, the Warren test was applied basically in two contextsthose involving automobile sales contracts between dealers and consumers, see Warren and Ex parte Williams, 555 So.2d 146 (Ala.1989), and those, like Ex parte Jones, 628 So.2d 316 (Ala.1993), involving stock-purchase agreements. See, also, Ex parte Clements, 587 So.2d 317 (Ala.1991), and other cases that showed that the Court applied the "contemplation" test sparingly, indicating that Warren had a narrow application. Ex parte Brice Building Co., 607 So.2d 132, 134 (Ala.1992) (quoting in part Roscoe v. Jones, 571 So.2d 1043, 1046 (Ala.1990)). This Court also applied the slightest-nexus test in a number of other contexts. See First Real Estate Corp. of Alabama v. Brown Marx Tower Ltd. Partnership, 620 So.2d 648 (Ala.1993) (real-estate-management agreement); Circle "S" Indus., Inc. v. Berryman, 613 So.2d 329 (Ala.1993) (consent judgment involving agreement not to compete); Garikes, Wilson, & Atkinson, Inc. v. Episcopal Foundation of Jefferson County, Inc., 614 So.2d 447 (Ala.1993) (contract for architectural services); and A.J. Taft Coal Co. v. Randolph, 602 So.2d 395 (Ala.1992) (mining lease).
[13] In Lopez v. Home Buyers Warranty Corp., 628 So.2d 361 (Ala.1993), the trial court applied the "slightest-nexus" test and compelled arbitration. This Court, applying the "contemplation" test, ordered the trial court to set aside its order, and it stated, "[W]e have recently overruled the Costa & Head `slightest nexus' test in favor of the more reasoned approach of the `contemplation' test applied in Ex parte Warren, 548 So.2d 157(Ala.), cert. denied sub nom. Jim Skinner Ford, Inc. v. Warren, 493 U.S. 998, 110 S.Ct. 554, 107 L.Ed.2d 550 (1989)." 628 So.2d at 363. The Court further stated that "[t]he Warren test examines whether the parties `contemplated substantial interstate activity' at the time they entered into the contract and accepted the arbitration clause," 628 So.2d at 363, and added the following in footnote 2:

"The standard in Warren better promotes our strong public policy against the use of predispute arbitration agreements. Its `contemplation' test is to be applied exclusively in determining whether a contract involves interstate commerce for purposes of applying the FAA to arbitration disputes. Continental Grain Co. v. Beasley, 628 So.2d 319 (Ala.1993)."
In Ex parte Jones, 628 So.2d 316 (Ala.1993), I wrote:
"In determining whether a transaction involves interstate commerce, I believe that the `slightest nexus' test set forth in Ex parte Costa & Head (Atrium), Ltd., and not the `contemplation' test set forth in Warren provides the proper analysis. See Warren, 548 So.2d at 160-63 (Maddox, J., dissenting). Although the majority concludes `that Warren represents a more reasoned approach than the Costa standard,' 628 So.2d at 318, the majority also recognizes that Warren `had a very limited applicability, as was indicated by the Warren opinion itself and as subsequent cases suggested.'"
628 So.2d at 318. (Some citations omitted.) In Lopez v. Home Buyers Warranty Corp., 628 So.2d 361 (Ala.1993), this Court also applied the "more reasoned approach" of Warren. 628 So.2d at 363. What did the Supreme Court of the United States think of this Court's conclusion that Warren provided a "more reasoned approach"? That Court vacated this Court's judgment in Lopez and remanded the case to this Court "for further consideration in light of Allied-Bruce Terminix Cos. v. Dobson." Home Buyers Warranty Corp. II v. Lopez, 513 U.S. at 1123, 115 S.Ct. 930 (citation omitted).
[14] Home Buyers Warranty Corp. II v. Lopez, 513 U.S. 1123, 115 S.Ct. 930, 130 L.Ed.2d 876 (1995).
[15] United States v. Lopez, 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995).