WOODALL, Justice.
These proceedings challenge orders of the Montgomery Circuit Court denying the motions of Jim Allen and Sea Star, Inc., (1) to transfer this action to Elmore County (case 1991656), and (2) to compel arbitration of the dispute (case 1991707). We reverse the order in case 1991707. In case 1991656, we deny the petition as moot.
This dispute arose out of the execution on August 11, 1997, of an “Agreement” by (1) Jim Allen, as President of Sea Star, Inc., (2) Frank C. Hardigree, personally, and (3) Frank C. Hardigree, as “managing *670 member” of Cameo, L.L.C. (“Cameo”). The Agreement purported to govern the conduct of the parties in constructing and operating a “Golf and Country Club” of “resort quality” in the Emerald Mountain community of Elmore County (“the Project”). The Project was to include an “eighteen hole golf course, driving range, ... putting green, ... a maintenance building and a golf cart storage building ... a golf clubhouse, parking lot, and bar and grill.” The clubhouse was to “include a pro shop, a minimum seventy-five seat bar and grill, approximately six thousand feet ... of above ground heated and cooled space and a parking lot,” at a minimum cost of $500,000. The total cost of the Project was to exceed $3,500,000.
Sea Star agreed to convey to Cameo approximately 200 acres in “fee simple determinable” (the “Property”) on which Cameo was to construct the Project. In consideration of this conveyance, Sea Star was to receive from Cameo or its successors (1) $1.00 at the time of closing, and (2) five percent “of all gross revenues ... from all activities conducted on the [property or originating from the ... Project ... including ... all golf course activities, greens fees, pro shop sales and rentals, food and beverage sales and restaurant activities.” This five-percent return was to “run with the Property” in perpetuity. In the event the Project ceased to operate and generate the five-percent fee, the Property was to revert to Sea Star in fee simple absolute.
For its part, Cameo agreed to “construct, maintain, operate and manage the Project to meet the standards of the top 5% (from a quality of maintenance, operations, landscaping, general appearance and management standpoint) of other golf and country clubs within a radius of one hundred (100) miles of the Property.” Cameo “warranted] ... that the [Project would] remain as a private club which permits the sale of private memberships but also remains open to the public on a priced daily fee basis.” Cameo was to employ “Ward W. Northrup or a comparable golf course architect,” to develop a “master plan and golf course general layout.”
On October 31, 1997, the parties executed and recorded a warranty deed with various exhibits, containing the essential provisions of the Agreement. Thereafter, Cameo employed Sentell Engineering, Inc. (“Sentell”), to develop the Project, and construction began under the direction of Golf Engineering Group, Inc., a Florida company affiliated with Ward Northrup.
On June 17, 1999, the parties executed a “Release Agreement,” which recited that Cameo was “approaching completion of the [Project contemplated] by the Agreement,” and that questions had arisen as to whether Sea Star “and/or Allen [had] breached [their] obligations under the Agreement.” The Release Agreement purported to release Sea Star and Allen from liability for any acts or omissions occurring before the date thereof.
The following day, the parties executed an instrument purporting to amend the Agreement. The amendment contained an arbitration clause that provided in pertinent part:
“Any dispute between the Parties hereto or between any of the Parties and any owner or affiliate of any other Party hereto with respect to the subject matter of this Agreement ... shall be submitted to mandatory, binding arbitration in accordance with the Rules of Procedure for Arbitration of [the] American Arbitration Association.... ”
Nevertheless, On October 22, 1999, Har-digree and Cameo filed a complaint in Montgomery Circuit Court against Sea Star, Allen, and Sentell. On November 29, 1999, Allen, Sea Star, and Sentell moved to *671 transfer the cause to Elmore County. On January 7, 2000, the trial court denied their motion, stating no reasons for its order.
On January 24, 2000, Allen and Sea Star moved to compel arbitration of the dispute, and, contemporaneously, filed with the American Arbitration Association a demand for arbitration. On April 21, 2000, the trial court denied their motion to compel arbitration.
On June 1, 2000, Allen and Sea Star petitioned this Court for a writ of mandamus directing the trial court to vacate its order denying their motion to transfer the cause to Elmore County (case 1991656). Also, on June 1, 2000, Allen and Sea Star appealed from the order of the trial court denying their motion to compel arbitration (case 1991707). Because disposition of the appeal resolves the arguments raised in the mandamus petition, we shall first address the appeal.
I. Case 1991707 — the Appeal
“This Court reviews de novo the denial of a motion to compel arbitration.” Fleetwood Enters., Inc. v. Bruno, 784 So.2d 277 (Ala.2000). Allen and Sea Star contend that the Federal Arbitration Act, 9 U.S.C. § 1 et seq., controls this case and requires the arbitration of this dispute. They are correct “if (1) there is a written agreement calling for arbitration, ... and (2) the contract containing the arbitration agreement ‘substantially affects interstate commerce.’” Marshall Durbin Farms, Inc. v. Fuller, 794 So.2d 320, 323 (Ala.2000). “A motion to compel arbitration is analogous to a motion for a summary judgment.” Ex parte Caver, 742 So.2d 168, 172 n. 4 (Ala.1999). Therefore, “[t]he party seeking to compel arbitration has the burden of proving the existence” of these two elements. Id.
“ ‘[A]fter a motion to compel arbitration has been made and supported, the burden [shifts to] the non-movant to present evidence that the supposed arbitration agreement is not valid or does not apply to the dispute in question.’ ” Fleetwood Enters., 784 So.2d at 280, quoting Jim Burke Automotive, Inc. v. Beavers, 674 So.2d 1260, 1265 n. 1 (Ala.1995) (emphasis omitted).
It is undisputed that the claims of Hardigree and Cameo against Allen and Sea Star are within the scope of the arbitration provision. Hardigree and Cameo, however, contend that the transaction does not substantially affect interstate commerce. The record contains the affidavit of Jim Allen, which states in pertinent part:
“3. Willard Byrd & Associates of Atlanta, Georgia prepared the initial concept design for the golf course. Hardigree and Cameo used this concept design prepared in Georgia for the basic design and layout of the golf course.
“4. It was contemplated at the time that Sea Star, Hardigree and Cameo entered into the Agreement that the actual design, layout and construction of the golf course would be performed by individuals and companies from other states. Section 3.4 of the Agreement specified that Ward W. Northrup would be the golf course architect. Mr. Northrup resided in Florida. His company, Golf Engineering Group, Inc. was also located in Florida. Golf Engineering Group, Inc. served as the contractor in charge of construction of the [Project].
“5. Ward Northrup and/or Scott Wil-loughby-Ray of Golf Engineering Group, Inc. traveled to Elmore County, Aabama from Florida on numerous occasions prior to the signing of the Agreement. I met with Mr. Northrup *672 and/or Mr. Willoughby-Ray at the [Project] site on at least ten occasions prior to signing the Agreement. In addition, Mr. Northrup was present at the closing when the Agreement was signed by the parties. Subsequent to signing the Agreement, I met at the [Project] site with Mr. Northrup, Mr. Willoughby-Ray and/or other employees of Golf Engineering Group, Inc. from Florida on at least five occasions.
“6. It was also contemplated at the time that Sea Star, Hardigree and Cameo entered into the Agreement that the vast majority of materials, equipment, machinery and supplies necessary to construct the golf course, clubhouse and other facilities would come from states other than Alabama. Based upon my personal experience in the real estate development business, I estimate that substantially more than 50% of the materials, equipment, machinery and supplies used in constructing the golf course, clubhouse and other facilities pursuant to the Agreement would be manufactured in states other than Alabama and transported into this State.
[[Image here]]
“9. At the time the parties signed [the amendment] containing the arbitration agreement, Golf Engineering Group, Inc. of Florida had performed a significant portion of the design and construction work on the golf course and that work was on-going....
“10. In addition, Cameron Construction from Lincolnton, Georgia was hired to construct the bridges on the golf course.”
Hardigree and Cameo do not refute the factual assertions in Allen’s affidavit. The affidavit, coupled with the unavoidable inferences suggested by the Agreement itself, compels the conclusion that this transaction substantially affects interstate commerce.
This arbitration clause was contained in an amendment to an overarching agreement that encompassed a considerable number of subsidiary transactions. Some of these transactions indisputably involved out-of-state individuals and entities, including Ward Northrup, Scott Willoughby-Ray, and their Florida-based company, as well as Willard Byrd & Associates of Atlanta, Georgia.[1]
Allen and Sea Star have demonstrated the existence of an arbitration agreement in a written contract that substantially affects interstate commerce. This showing is sufficient to shift the burden to Hardi-gree and Cameo to present evidence that the arbitration agreement is not valid or does not apply to this dispute. Jim Burke Automotive, Inc. v. Beavers, 674 So.2d 1260, 1265 n. 1 (Ala.1995).
In attempting to carry this burden, Hardigree and Cameo present only one argument that merits discussion. They contend that Allen and Sea Star waived the right to compel arbitration. This is so, they argue, because Allen and Sea Star challenged venue of the cause before moving to compel arbitration. Hardigree and Cameo argue that Allen and Sea Star “substantially invok[ed] the litigation process,” and that they were “substantially prejudicefd]” thereby. Brief of Appellees, at 8-9 (quoting Companion Life Ins. Co. v. Whitesell Mfg., Inc., 670 So.2d 897, 899 (Ala.1995)).
None of the cases cited by Hardigree and Cameo, however, supports this propo *673 sition. Instead, the opposite result is compelled by Thompson v. Skipper Real Estate Co., 729 So.2d 287 (Ala.1999), wherein we held: “A defendant has the right to have the proper venue established before it has any obligation to move to compel arbitration.” Id. at 292. (Emphasis added.)[2]
That case arose out of an action commenced by James W. Thompson and Michelle K. Thompson against, among others, Skipper Real Estate Company (“Skipper”). Id. at 288. The action proceeded according to the following chronology:
“The Thompsons filed their complaint on June 5, 1997. The defendants were served with the complaint on July 1, 1997. The defendants’ attorney filed a notice of appearance on July 16, 1997. On July 29, 1997, the defendants filed a motion to transfer the action from Mobile County to Baldwin County. On that same date, the defendants served the plaintiffs with a set of interrogatories. On August 19,1997, the Thompsons filed a brief in opposition to the defendants’ motion to transfer the action, requesting that the Mobile Circuit Court delay its ruling until they had completed discovery with respect to the venue issue. On January 7, 1998, the Thomp-sons took the depositions of George Skipper and Susan Harmon. Harmon was the office, manager and closing agent for Skipper Real Estate Company. In those depositions, Skipper and Harmon were asked questions pertaining to the venue issue, as well as questions pertaining to the merits of the fraud and breach-of-contract claims. Skipper and Harmon were also questioned about the arbitration provision in the sales contract. At one point during Skipper’s deposition, the defendants’ attorney, in response to a question posed by the Thompsons’ attorney, stated:
“ ‘You’re assuming that I’ll be defending Mr. Pullian and other defendants on the merits of this case. We’re simply at the threshold of transferring the case to Baldwin County. Right now, the defendants are unified. If we ever get to that issue, provided arbitration allows us to, you’ll then probably discover that the defendants will have different attorneys on the merits.... ’
“The Mobile Circuit Court entered an order on January 80, 1998, transferring the case to Baldwin County. Three months and eight days later, on May 8, 1998, the defendants moved the Baldwin Circuit Court to compel the Thompsons to arbitrate their claims. On May 14, 1998, the Baldwin Circuit Court dismissed the Thompsons’ complaint and ordered that their claims be arbitrated. On May 20, 1998, the Thompsons filed a brief in opposition to the motion to compel, and on May 21, 1998, they filed a motion to alter, amend, or vacate the judgment of dismissal. The court denied that motion [and the Thompsons appealed].”
Id. at 289 (emphasis added). The trial court dismissed the Thompsons’ complaint. One of the issues on appeal was whether Skipper had waived the right to compel arbitration.
Before addressing that issue, the Court set forth a number of general principles:
*674 “ ‘ “It is well settled under Alabama law that a party may waive its right to arbitrate a dispute if it substantially invokes the litigation process and thereby substantially prejudices the party opposing arbitration. Whether a party’s participation in an action amounts to an enforceable waiver of its right to arbitrate depends on whether the participation bespeaks an intention to abandon the right in favor of the judicial process and, if so, whether the opposing party would be prejudiced by a subsequent order requiring it to submit to arbitration. No rigid rule exists for determining what constitutes a waiver of the right to arbitrate; the determination as to whether there has been a waiver must, instead, be based on the particular facts of each case....
[[Image here]]
“ ‘ “The general rule with regard to waiver of one’s right to arbitrate was stated in American Dairy Queen Corp. v. Tantillo, 536 F.Supp. 718 (M.D.La.1982):
“ ‘ “ ‘It is well settled that there is a strong federal policy favoring arbitration and a waiver of the right to compel arbitration will not be lightly inferred [Citations omitted.]’
“ ‘ “536 F.Supp. at 720. The court went on to say:
“ ‘ “ ‘Therefore, the burden on one seeking to prove waiver is a heavy one. The question of what constitutes a waiver of the right of arbitration depends on the facts of each case.’ ” ’ ”
729 So.2d at 290-91 (emphasis added).
Holding that no waiver had occurred, this Court affirmed the trial court’s judgment. In so doing, it acknowledged that “a little over 11 months [had] elapsed between the date the Thompsons filed their complaint and the date the defendants filed their motion to compel arbitration.” Id. at 292. Nevertheless, the Court considered it “significant ... that the parties spent almost eight of those months litigating the venue issue.” Id. (emphasis added). The Court stated:
“Our survey of the caselaw does not indicate that the mere filing of a motion to transfer an action to the proper venue; the filing of one set of interrogatories with such a motion; and the participation in two depositions, partly for the purpose of resolving the venue issue, constitutes a waiver of a right to compel arbitration.”
Id. Moreover, the Court noted, the Thomp-sons had learned by deposition taken in January 1998, that is, only seven months after the complaint was filed, that Skipper was contemplating arbitration.
The Court was unconvinced by the affidavit of the Thompsons’ attorney, which was submitted for the purpose of demonstrating prejudice. It reasoned that the “attorney [had] spent a great deal of his [time] on th[e] case litigating the venue issue,” id. at 293, which, it had concluded, Skipper was entitled to resolve “before it [had] any obligation to move to compel arbitration.” Id. at 292.
Thompson controls this case. Indeed, the facts of this case are more compelling than those in Thompson. First, there has been no discovery in this case, while in Thompson, Skipper “served the plaintiffs with a set of interrogatories” before moving to compel arbitration. Second, in this case, the plaintiffs learned of the defendants’ intention to arbitrate 91 days after the complaint was filed, while in Thompson, seven months elapsed before the plaintiffs received any such notice. Moreover, the legal resources of Hardigree and Cameo have been expended on nothing but the issues of venue and arbitration, neither *675 of which forms a basis for prejudice under Thompson.[3]
Indeed, if Thompson stands for anything, it stands for the proposition that Allen and Sea Star had a right to seek a judicial determination that the Elmore Circuit Court was the proper forum in which to resolve the arbitration issue. In other words, under the clear mandate of Thompson, there was, as a matter of law, no waiver of the right to compel arbitration.[4]
In short, the trial court erred in denying the motion of Allen and Sea Star to compel arbitration. That order is, therefore, reversed, and the cause is remanded.
II. Case 1991656 — the Mandamus Petition
Our disposition of case 1991707 renders moot the petition for writ of mandamus filed by Allen and Sea Star in case 1991656. Therefore, the petition is denied as moot.[5]
In summary, the order in case 1991707 is reversed and the cause is remanded. In case 1991656, the petition for writ of mandamus is denied as moot.
1991656 — DENIED AS MOOT.
1991707 — REVERSED AND REMANDED.
SEE, BROWN, HARWOOD, and STUART, JJ., concur.
HOUSTON and LYONS, JJ., concur in the rationale in part and concur in the judgment.
MOORE, C.J., concurs in the result.

. This case is, therefore, the converse of Sisters of the Visitation v. Cochran Plastering Co., 775 So.2d 759 (Ala.2000), where the arbitration clause was contained in one of the subsidiary transactions.

. Hardigree and CAMCO also rely on Ex parte Bentford, 719 So.2d 778 (Ala.1998), overruling on other grounds recognized by, Green Tree Fin. Corp. of Alabama v. Vintson, 753 So.2d 497 (Ala.1999); Morrison Restaurants, Inc. v. The Homestead Village of Fairhope, Ltd., 710 So.2d 905 (Ala.1998); and Ex parte Smith, 706 So.2d 704 (Ala.1997). In none of those cases, however, was the movant’s delay in seeking to compel arbitration attributable — or in any way related — to an effort to obtain a judicial determination of venue.

. In this respect, Thompson and this case are both distinguishable from Companion Life, on which Hardigree and CAMCO rely. In that case, Companion Life Insurance Company had, before seeking to compel arbitration, removed the cause to "the United States District Court for the Northern District of Alabama.” Companion Life, 670 So.2d at 898. It did so in order to "assertf ] that [the plaintiff’s] state law claims were preempted by the Employee Retirement Income Security Act of 1974.” 670 So.2d at 898. See also Thompson, 729 So.2d at 292 (distinguishing Companion Life on that ground).

. In this connection, we do not overlook the cases in which we have reviewed a trial court’s determination of waiver under an abuse-of-discretion standard. See Thompson, supra; Companion Life, supra; Ex parte McKinney, 515 So.2d 693 (Ala.1987). However, the trial court has no discretion to deviate from a case that is directly on point.

.We have not overlooked Sentell, which, like Allen and Sea Star, moved to transfer the cause to Elmore County. Unlike Allen and Sea Star, however, Sentell did not file a mandamus petition. Instead, on July 13, 2000, after this Court ordered answers and briefs in case 1991656, and six months after the trial court denied its venue motion, Sentell filed an "Answer of Respondent Sentell Engineering, Inc.” In its answer, it merely "adopt[ed] the position and brief of [Allen and Sea Star].” Thus, the only mandamus petition before this Court is that filed by Allen and Sea Star, containing arguments that are now moot.