Ray Washam and Ballard Services, Inc. (together hereinafter referred to as "Ballard"), appeal from an order denying their motion to compel arbitration of an action filed against them and others by Rosa Conner and her husband Joseph Conner. We reverse and remand.
According to the allegations in the complaint, a dispute arose when the house owned by the Conners was damaged by fire. At that time, the Conners had in force a homeowners' insurance policy with Odessy Re (London) Ltd. ("Odessy"), through Southern Coastal Underwriters, Inc. ("Southern Coastal"). The complaint alleged that Odessy and Southern Coastal, in conjunction with Crawford Company ("Crawford"), the claims adjuster investigating the Conners' claim, wrongly refused to pay the benefits provided by the policy. The complaint alleged breach of contract and bad-faith failure to pay against Odessy, Southern Coastal, and Crawford. The complaint also contained counts alleging breach of contract and fraud against Ballard, the construction contractor who undertook to repair the damaged building, but who allegedly did so improperly.[1]
Ballard's agreement to repair the Conners' home was set forth in a four-page instrument styled an "Agreement for the Remodeling of Real Property" (the "Agreement"). Blanks were provided at the bottoms of pages two and three for initials, and at the bottom of page four for two signatures. Both Joseph Conner and Rosa Conner initialed page two, and page three was initialed only by Rosa. Page three contained a clause that provided, in pertinent part:
 "Owner and [Ballard] agree to cooperate with one another in avoiding and in resolving any disputes that may arise between them. Any and all claims that arise between Owner and [Ballard] under this agreement which are not resolved between them shall be decided by binding arbitration with an arbitrator to be supplied by the Better Business Bureau. . . ."
The last page of the Agreement contained two lines for signatures under the term "Owner." Rosa Conner signed her name on both lines.
Ballard moved to compel arbitration of the dispute based on the arbitration clause *Page 521 
in the Agreement. The trial court denied the motion and Ballard appealed. The appeal presents two issues: (1) whether the agreement to repair the Conners' house is a transaction that substantially affects interstate commerce, and (2) whether the arbitration agreement may be enforced against Joseph Conner, despite the fact that he did not "sign" the Agreement.
 I. Does the Transaction Affect Interstate Commerce?
Notwithstanding state laws to the contrary, the Federal Arbitration Act, 9 U.S.C. § 1 et seq. (the "FAA"), makes enforceable written arbitration agreements that "substantially affect interstate commerce."Sisters of the Visitation v. Cochran Plastering Co., 775 So.2d 759, 767
(Ala. 2000). In Sisters of the Visitation, this Court concluded that, on the basis of the evidence presented, a contract between two Alabama parties for the remodeling of a chapel did not substantially affect interstate commerce so as to invoke the FAA. The Conners contend that this case is not materially distinguishable from Sisters of theVisitation, and, consequently, that the Agreement does not have the necessary nexus with interstate commerce to require them to submit their claims to arbitration. Ballard, on the other hand, attempts to distinguish Sisters of the Visitation, contending that the FAA applies, because, it argues, the involvement of various out-of-state entities is so vital to this transaction that it could not have been performed without it.
The dispute in Sisters of the Visitation arose out of a contract between two local entities — the Sisters of the Visitation ("the Sisters") and Cochran Plastering Company, Inc. ("Cochran"). The transaction between the Sisters and Cochran was a part of a larger project for the restoration of a "chapel at the Visitation Monastery." 775 So.2d at 760. The contract required Cochran to "repair cracks in the plaster in the ceilings and wall of the chapel, to cast and install plaster moldings, and to pin up all loose moldings with screws and washers." Id. It was the Sisters who began arbitration proceedings, which Cochran sought to enjoin. Cochran contended that the transaction affected interstate commerce too remotely to trigger the application of the FAA. This Court agreed, holding that the contract did not "substantially affect interstate commerce." 775 So.2d at 767.
This Court found five factors to be particularly pertinent in an interstate-commerce analysis: (1) the citizenship of the parties; (2) the source of the "tools and equipment" necessary to consummate the transaction; (3) the "allocation of costs of services and materials"; (4) the subsequent movement, if any, of the "object of the services" across state lines; and (5) the "degree of separability from other contracts" involved in the transaction. 775 So.2d at 765-67. This Court first noted that "the transaction involve[d] a contract solely between two local parties, each of whom is unaffiliated with an entity involved in interstate commerce." Id. at 765. The record did not indicate what percentage of the total price was attributable to materials or services that moved across state lines. Id. Moreover, the contract between the Sisters and Cochran had only a tangential relationship with the other contracts necessary to the overall renovation project, some of which did
involve interstate commerce.
Unlike the dispute in Sisters of the Visitation, this case involvesclaims against out-of-state entities. Specifically, the Conners' complaint contains counts against not only Ballard, but also foreign entities Odessy, Southern Coastal,[2] and Crawford. *Page 522 
Crawford is a Georgia corporation with its principal place of business in Atlanta, Georgia. These claims naturally flow from the inextricable interrelationship of the parties and their logical connection with the Agreement.
For example, the Agreement contained no contract price. It expressly provided that the cost of the repairs was "to be negotiated between the Insurance Co. and [Ballard]." Ballard's involvement with the transaction was summarized in an affidavit of Kevin Shubird, Ballard's president. He stated:
 "Ballard first became aware of the Conner project when we received a bid request from Charles Goodwyn at Crawford Co. some time prior to December 9, 1998. . . . We understood from the request that the Conners had experienced a house fire which was covered by their homeowners insurance. We further understood that Ballard was not the only contractor contacted about doing the repairs.
 "In response to the bid request, we submitted an estimate. After some negotiation between ourselves and Crawford Co., we agreed with Crawford Co. as to an amount to fund the repair work, and signed a contract with the Conners that reflects that the price would be as negotiated with the insurance company. So, Ballard was contacted by and approved by Crawford Co. Ballard could not have done the job without the approval of Crawford Co. The Conners did not negotiate with Ballard about the amount to be paid for making the repairs on their home, and in fact, no portion of the payment for the services performed by Ballard was made by the Conners."
(Emphasis added.)
To be sure, Sisters of the Visitation did involve an "out-of-state insurance company from which Cochran obtained liability insurance for the project, pursuant to its contract with the Sisters." 775 So.2d at 776 (Hooper, C.J., dissenting) (emphasis added). There was no evidence, however, that the dispute between the Sisters and Cochran had any
connection with the liability insurer. The majority deemed such contracts to lack sufficient proximity to the subject transaction. In this case, insurance plays a much different role than in it did in Sisters of theVisitation. These insurers are, of course, named parties and the source of the money for the repairs. In light of the direct involvement of Odessy, Southern Coastal, and Crawford, it is not difficult to understand why the Conners deemed it necessary to sue them in addition to Ballard.
Moreover, this transaction directly involved an out-of-state nonparty, namely, Jim Walter Mid-State Homes ("Jim Walter"). Shubird summarized this involvement as follows:
 "Sometime during the process of agreeing upon the amount to fund the repair work and making the repairs, [Ballard] learned that the home was encumbered by a mortgage in favor of [Jim Walter] located in Tampa, Florida, and that due to the estimated cost of the repairs, Jim Walter would have to be listed as a co-party on any checks issued to pay for the repairs. The entire amount of the initial repairs ($29,349.01), plus the cost of some supplemental repairs requested by the Conners ($2,716.22), was paid by two checks *Page 523 drawn upon a Pensacola, Florida, bank by Southern Coastal, also located in Pensacola, Florida. In both instances, the checks were made out jointly to the Conners and Jim Walter. Southern Coastal sent the checks to the Conners, who then signed and sent the checks to Ballard. We then sent the checks to Jim Walter in Tampa, requesting that its representative endorse the checks and send them back to us. Only after Jim Walter returned the checks properly endorsed could Ballard's authorized representative endorse the checks and deposit them in Ballard's bank."
(Emphasis added.)
One final distinction between this case and Sisters of the Visitation
is that here the record does indicate that Ballard's performance was directly dependent upon many building materials that had been purchased for the "Conner project" and delivered from sources in other states, including insulation, paint, bathroom fixtures, cabinets, countertops, windows, plasterboard, floor covering, and lumber. This factor, along with the factors previously discussed, compels the conclusion that the transaction between Ballard and the Conners has a sufficient nexus with interstate commerce to trigger the application of the FAA.
 II. The Effect of the Absence of Joseph Conner's Signature
The second issue is whether the arbitration agreement may be enforced against Joseph Conner, despite the fact that he did not technically "sign" the Agreement. The Conners raise this argument for the first time on appeal. We consider it only because this Court "will affirm the trial court if its ruling is correct on any valid ground or rationale, even one rejected or not considered by the trial court." Rogers FoundationRepair, Inc. v. Powell, 748 So.2d 869, 872 (Ala. 1999); see also Smithv. Equifax Servs., Inc., 537 So.2d 463, 465 (Ala. 1988).
As stated previously in this opinion, the Agreement does not contain Joseph Conner's signature, although it does contain his initials. It is well established, however, that "[a] plaintiff cannot simultaneously claim the benefits of a contract and repudiate its burdens and conditions." Southern Energy Homes, Inc. v. Ard, 772 So.2d 1131, 1134
(Ala. 2000); see Ex parte Stamey, 776 So.2d 85 (Ala. 2000); Infiniti ofMobile, Inc. v. Office, 727 So.2d 42 (Ala. 1999); Ex parte Dyess,709 So.2d 447, 451 (Ala. 1997); Ex parte Warren, 718 So.2d 45, 47-48
(Ala. 1998) (the Court, in a plurality opinion, stated that one who asserts that she is not a party to a contract in order to avoid arbitration "disclaim[s] any basis for recovery on her claims" under the contract); see also Southern Energy Homes, Inc. v. Hennis, 776 So.2d 105,108 (Ala. 2000) (mobile-home buyer could not "pursue his breach-of-express-warranty claim" and "at the same time, disavow the arbitration provision contained [in the written warranty]"); SouthernEnergy Homes, Inc. v. Kennedy, 774 So.2d 540, 547 (Ala. 2000) (plaintiffs were "foreclosed from maintaining any claim they may have had against Southern Energy for its alleged breach of the express written warranty" the plaintiffs swore by affidavit they never received); Delta Constr.Corp. v. Gooden, 714 So.2d 975, 981 (Ala. 1998).
The Agreement defines as the "Owner" Joseph and Rosa Conner "whether one or more." Joseph initialed page two and Rosa signed page four twice as the "Owner." Joseph and Rosa sued jointly for breach of the Agreement. Under our well-established caselaw, Joseph cannot simultaneously claim the benefits of the Agreement and repudiate its arbitration provision. *Page 524 
For these reasons, the judgment of the trial court is reversed, and the cause is remanded.
REVERSED AND REMANDED.
Houston, See, Lyons, Brown, Harwood, and Stuart, JJ., concur.
Johnstone, J., dissents.
[1] The Conners also alleged fraud as to Washam, who, it is alleged, was an employee of Ballard.
[2] The record is not entirely clear as to the official "residence" of Southern Coastal. By affidavit, however, Ballard alleges that Southern Coastal is "located in Pensacola, Florida."