872 So.2d 798 (2002)
ALAFABCO, INC.
v.
The CITIZENS BANK et al.
1010703.
Supreme Court of Alabama.
August 30, 2002.
Rehearing Denied November 27, 2002.
Daniel E. Boone, Florence, for appellant.
Robert V. Wood, Jr., and Ruth O. Priest of Spurrier, Rice, Wood & Hall, Huntsville, for appellee The Citizens Bank.
WOODALL, Justice.
Alafabco, Inc., appeals from the trial court's order granting the motion of The Citizens Bank and its employees to compel arbitration of this dispute. We reverse and remand.

*799 I. Factual Background

The relationship between the parties and the genesis of this dispute were briefly summarized in a complaint filed on November 15, 2000, by Alafabco, Inc., and three of its officers or employees, namely, Donnie Cottingham, Joann Beck, and Weston Beck, against the Bank and a number of its employees, including Doug Alexander, Roger Campbell, and Wayne Gentry (hereinafter referred to collectively as "the Bank"). In pertinent part, the complaint alleged:
"6. In 1986, the plaintiffs and defendants entered into a quasi-contractual relationship wherein the plaintiffs secured construction contracts and the defendants provided the necessary operating capital to complete the project. Upon completion of a project, the plaintiffs repaid the funds, together with accrued interest, to the defendants.[[1]]
"7. The plaintiffs continued to operate under the implied agreement until 1998, at which time the defendants encouraged plaintiffs to bid on a large project [for Champion International (the full and correct name of this company is not clear from the record) at its facilities in Courtland, Alabama,] and then, when plaintiffs' bid was accepted and plaintiffs began work, the defendants refused to provide the necessary operating capital for the completion of the contract. As a result of the defendants' breach of the agreement, the plaintiffs began to incur massive debt."
According to Alafabco, it attempted to compensate for the alleged breach by "using the monies provided by The Bank in the prior funding." Appellant's Brief, at 4. Nevertheless, it "became delinquent in repaying its existing obligations to [the] Bank." Appellant's Brief, at 4. Subsequently, the parties negotiated an agreement, pursuant to which "all of the loans with the Plaintiffs were restructured and redocumented through various notes dated May 3, 1999." Appellees' Brief, at ix. Along with the "renewal notes" executed as a result of these negotiations, the parties signed a document containing the following pertinent provisions:
"AGREEMENT TO ARBITRATE. The Citizens Bank (`Lender') and the undersigned agree that all disputes, claims, or controversies (`Disputes') between them, whether individual, joint, or class in nature, including contract and tort disputes and any other matter at law or equity, shall be resolved by arbitration upon request of either party at any time, notwithstanding the prior filing by either party of any legal action, except as otherwise indicated in this Agreement or agreed to in writing by the parties. In an arbitration, an arbitrator, who is an independent, neutral party, gives a decision after hearing the positions of the parties. It is understood and agreed that arbitration pursuant to this agreement shall be binding upon both parties and that both parties are waiving their respective rights to a jury trial. However, nothing in the loan documents or this agreement shall preclude any party from seeking equitable relief from a court of competent jurisdiction.
"....
"GOVERNING LAW. The Federal Arbitration Act shall apply to the construction, interpretation, and enforcement of this arbitration agreement. The arbitration of any dispute shall be governed by the Rules of the American Arbitration Association. If there is an inconsistency *800 between these rules and this Agreement, this Agreement shall govern."
Subsequently, Alafabco defaulted on its payments under the "renewal notes," and, it alleges, the Bank published notices of foreclosure on its property. Consequently, Alafabco sought bankruptcy protection in the United States Bankruptcy Court for the Northern District of Alabama. That action was settled and Alafabco's petition in bankruptcy was dismissed.
However, that settlement involved a second debt restructuring, evidenced by a second set of renewal notes executed December 10, 1999. At that time, the amount allegedly due the Bank was approximately $430,000. The debt restructuring involved a note of the individual plaintiffs, secured by a mortgage on commercial real estate owned by Cottingham and the Becks; a note of Alafabco, secured by accounts receivable, inventory and supplies, fixtures, machinery and equipment, and motor vehicles; and a mortgage on Cottingham's house. That same day, the parties also executed an arbitration agreement containing provisions functionally identical to the arbitration agreement signed on May 3, 1999 (the May 3, 1999, arbitration agreement and the December 10, 1999, arbitration agreement are hereinafter referred to collectively as "the Arbitration Agreements").
The plaintiffs' 18-count complaint, filed nearly a year after the execution of the second set of renewal notes, sought compensatory and punitive damages under multiple theories, including breach of contract, fraud, breach of fiduciary duties, defamation, conspiracy, intentional infliction of emotional distress, and interference with a contractual or business relationship. The Bank moved to compel arbitration of the dispute, based on the Arbitration Agreements. The trial court granted the motion, and Alafabco appealed.

II. Discussion
On appeal, Alafabco contends that the Arbitration Agreements are unenforceable because, it argues, the transaction at issue does not have a nexus with interstate commerce sufficient to invoke the Federal Arbitration Act, 9 U.S.C. § 1 et seq. ("the FAA"). The Bank's first response is that the agreements are enforceable whether or not the transaction has a connection with interstate commerce. This is so, because, it argues, this case involves postdispute agreements, which, it contends, are not contrary to state law. More specifically, it states: "[T]he Plaintiffs entered into the Arbitration Agreements after they had already defaulted on their various obligations to the Bank.... As a material consideration to the restructuring of [their] obligations, the plaintiffs agreed to submit any dispute heretofore or thereafter arising ... to binding arbitration." Appellees' Brief, at 2 (emphasis added). "Therefore," the Bank continues, "the Arbitration Agreements ... were executed after a dispute had already arisen and were not subject to the [interstate-commerce] restriction" as would be the case had they been executed before the dispute. Appellees' Brief, at 4. We disagree with the Banknot with its characterization of the chronology of events,[2] but with its conclusions.
Unlike predispute arbitration agreements, which contravene Ala.Code 1975, § 8-1-41(3), postdispute arbitration agreements are enforceable in Alabama, either under the Alabama Arbitration Act, Ala.Code 1975, §§ 6-6-1 to -16 ("the AAA"), or at common law. Ala.Code 1975, *801 § 6-6-16; Fuerst v. Eichberger, 224 Ala. 31, 33, 138 So. 409, 410 (1931); Rodney Max, "Arbitrationthe Alternative to Timely, Costly Litigation," 42 Ala. Lawyer 309, 317-18 (1981). However, there is no evidence in this case of an agreement to proceed under the AAA or the common law. On the contrary, the Arbitration Agreements provided: "The Federal Arbitration Act shall apply to the construction, interpretation, and enforcement of this Agreement." (Emphasis added.)
Moreover, the Bank did not propose in the trial court to arbitrate outside the framework of the FAA. On the contrary, it based its "Motion to Stay Action and Compel Arbitration" on the FAA, stating: "An Agreement which contains specific provisions requiring parties to Arbitrate disputes involving or [a]ffecting interstate commerce is specifically enforceable under the Federal Arbitration Act, 9 U.S.C. Section 1, et seq.; Allied-Bruce Terminix Companies v. Dobson, 513 U.S. 265 (1995)." It then cited various examples of how, in its view, "the dealings of the parties... substantially contemplated and impacted upon interstate commerce."
It repeated those contentions in its "Brief in Support [of the Motion] to Compel Arbitration." There, it also argued that this case is distinguishable from Sisters of the Visitation v. Cochran Plastering Co., 775 So.2d 759 (Ala.2000), in which this Court determined, applying a five-part test, that the transaction at issue there did not substantially affect interstate commerce, and, therefore, that an arbitration agreement was not enforceable under the FAA. In this case, neither the motion nor the supporting brief refers to the AAA or to arbitration under the rules of common law. Clearly, the parties did not contemplate arbitration under the authority of the AAA or the common law of Alabama.
Consequently, arbitration of this dispute must proceed, if at all, under the FAA.
The FAA preempts Alabama law disfavoring predispute arbitration agreements only if the dispute is subject to a written arbitration agreement "relating to a transaction substantially affecting interstate commerce." Ex parte Greenstreet, Inc., 806 So.2d 1203, 1209 (Ala.2001); see also F.A. Dobbs & Sons, Inc. v. Northcutt, 819 So.2d 607 (Ala.2001). The proponent of arbitration bears the burden of proving a sufficient connection with interstate commerce, Brookfield Constr. Co. v. Van Wezel, 841 So.2d 220, 222-23 (Ala.2002); Tran-South Fin. Corp. v. Bell, 739 So.2d 1110 (Ala.1999), applying the five-part test set forth in Sisters of the Visitation.
In an attempt to carry this burden, the Bank presented the affidavit of Roger Campbell, its "president and chief executive officer." He recited the following factors as bearing on the interstate-commerce question:
"The Citizens Bank is a lending institution which routinely conducts business in interstate commerce, such as the business conducted between it and the Plaintiffs, at issue in this litigation. The business records attached as Exhibit A and Exhibit B clearly demonstrate that a substantial portion of the money loaned by [the Bank] to Alafabco was used to finance labor and materials used by Alafabco to perform work at a Champion International facility in North Carolina. Additionally, the security interest held by The Citizens Bank in assets of the Plaintiffs include inventory manufactured and created using subproducts obtained outside the state of Alabama, utilizing raw materials manufactured outside the state of Alabama and sold through utilization of the U.S. mails, telephones and other methods of communication through interstate commerce. *802 The security interest of The Citizens Bank and accounts receivable of the plaintiff Alafabco, Inc., are distributed through the U.S. mails, payments are obtained through the U.S. mails and proceeds are deposited in bank accounts subject to Federal Regulations and clearance through interstate settlement procedures and policies. The debt restructuring at issue in this matter was carried out in the course of a proceeding in the United States Bankruptcy Court, a court which has a profound impact upon interstate commerce, in my judgment. Moreover, payments by and between the parties in connection with their dealing were made by check which were cleared by the Federal Reserve, using the U.S. mails and interstate financial settlement procedures and institutions. In the course of dealings between the parties, The Citizens Bank mailed notices of foreclosure and other correspondence related to the dealing between the parties through the United States Postal Service. Further, the policies and procedures governing the actions of The Citizens Bank, its officers, employees and governing the transactions between the parties to this litigation were subject to regulation by Federal Agencies and Federal Laws. Further, the loans issued by The Citizens Bank and the debt restructuring at issue facilitated the operation of Alafabco, Inc., which did business affecting interstate commerce, and directly engaged in interstate commerce, including contract work in North Carolina and the state of Tennessee, as demonstrated by the attached records."
These recitations fall into six general categories, namely, (1) the nature of the Bank's business; (2) the nature of Alafabco's business; (3) the general "course of dealings between the parties"; (4) the use of various communication media in dealings between the parties; (5) the existence of federal regulations; and (6) the nature of the specific transaction at issue. We shall address these categories in the context of Sisters of the Visitation.
Recently, we stated:
"The test adopted in Sisters of the Visitation focuses on the quantity and quality of involvement of foreign entities with the subject transaction. Specifically, the subjects of inquiry are (1) the `citizenship of the parties,' (2) the origin of any `tools and equipment' actually used in the transaction, (3) the `allocation of cost of services and materials,' (4) the `subsequent movement across state lines' of the `object of the services,' and (5) the `degree of separability from other contracts.' 775 So.2d at 765-67. An analysis applying these factors is `necessarily fact intensive.' Id. at 765 n. 5."
Brookfield Constr. Co. v. Van Wezel, 841 So.2d 220, 221 (Ala.2002).

A. Categories One, Two, and Three
The Bank argues that the overall nature of its business operations, those of Alafabco, and the "course of dealings of the parties" supports arbitrability. We disagree with this argument. Indeed, these factors are largely irrelevant to an FAA interstate-commerce analysis.
The FAA renders enforceable any "written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, ... or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal...." 9 U.S.C. § 2 (emphasis added). Thus, on its face, the FAA applies only to "transactions," "contracts," and "controversies."
The FAA defines "transactions" in the maritime context, as including "charter parties, bills of lading of water carriers, *803 agreements relating to wharfage, supplies furnished vessels or repairs to vessels, collisions, or any other matters ... which, if the subject of controversy, would be embraced within admiralty jurisdiction." 9 U.S.C. § 1 (emphasis added). The FAA focuses on the narrow concepts of acts, omissions, or agreements, not on the broader concepts on which the Bank focuses, such as the nature of the parties' businesses or the general "course of dealings between the parties." Thus, the facts that the Bank "routinely conducts business in interstate commerce"; that Alafabco owns and uses materials "manufactured outside the state of Alabama"; and that Alafabco operates its business with funds borrowed from the Bank cannot support arbitrability of this dispute.
Moreover, under §§ 1 and 2, the FAA applies only where the transaction affecting interstate commerce is the "subject of [the] controversy." The relevant transactions in this case are the debt restructurings of May 1999 and December 1999, evidenced by the renewal notes and the attendant Arbitration Agreements. Indeed, the Bank characterizes the dispute as "whether Alafabco was in default on the contract[s] between it and the Bank." Appellees' Brief, at 4. Thus, testimony regarding loans to Alafabco cannot support arbitrability, absent a showing thatat a minimumthey were part of the restructured debt, that is, that they were somehow involved in this dispute. For these reasons, the recitations related to categories one, two, and three do not establish that the transaction had a substantial effect on interstate commerce.

B. Categories Four and Five
The Bank argues that involvement of the various forms of communication recited in Campbell's affidavit, such as the United States Postal Service "and other methods of communication," as well as the existence of federal regulations governing loan transactions and deposits in general, can support arbitrability. We disagree with this argument also.
Much of the rationale in the preceding section weighs with equal force against this argument. Additionally, the substantial-effect test of Sisters of the Visitation logically contemplates the converse, namely, the de minimis effect. Thus, in Aronov Realty Brokerage, Inc. v. Morris, 838 So.2d 348 (Ala.2002), a plurality of this Court recently concluded that a $1,000 earnest-money deposit on the purchase of a condominium unit paid to Regions Bank, allegedly a foreign corporation, "was de minimis as compared to the entire purchase price [of $106,000 plus miscellaneous charges and fees]." 838 So.2d at 359. Consequently, the transaction did not satisfy the Sisters of the Visitation substantial-effect test. This was true, even when considered in the aggregate with "combined payments to State Farm, also a foreign corporation, ... of $217 and $214 for contents insurance and flood insurance," and a $495 payment for a "home warranty through American Home Shield," also a foreign entity. Morris, 838 So.2d at 359. The combined payments "represent[ed] less than one percent of the purchase price." Id. See also Ex parte Learakos, 826 So.2d 782 (Ala.2001) ("the ostensible transfer of the funds for the plaintiff's $1,000 earnest money payment from the drawee bank in Illinois to the Alabama payee of the check drawn in Alabama [did] not establish a substantial effect of [a] real estate sale and purchase on interstate commerce").
The interstate communications services and sundry federal regulations on which the Bank seeks to rely touch this transaction so remotely and tangentially as to warrant no consideration. Holding that a transaction is subject to the FAA simply by virtue of the ordinary use of interstate *804 communication media in its furtherance, or by Congressional regulation of some aspect of one party's business, would effectively transform every "local" transaction into a "national" one. As Sisters of the Visitation points out, such an approach is impermissible under our federal system of government. 775 So.2d at 767 (citing NLRB v. Jones & Laughlin Steel Corp., 301 U.S. 1, 37, 57 S.Ct. 615, 81 L.Ed. 893 (1937)).

C. Category Six
Finally, we address the Bank's contentions regarding the transaction at issue, specifically, Campbell's affidavit testimony that "the loans issued by The Citizens Bank and the debt restructuring at issue facilitated the operation of Alafabco, Inc., which did business affecting interstate commerce, and directly engaged in interstate commerce, including contract work in North Carolina and the state of Tennessee, as demonstrated by the attached records." This testimony touches on a valid consideration, and, if supported by the record, could afford a basis for arbitrability. This is so, because it suggests that part of the money specifically involved in the debt restructuring was used to finance operations in North Carolina and Tennessee.
In that connection, the record contains four invoices, three of which evidence interstate transactions. In particular, Alafabco invoice 676 in the amount of $39,574.36, dated August 21, 1995, is addressed to "Champion International, Main Street, Canton, NC." The subject of invoice 676 is "Doctor Blade Maintenance, Canton Mill," and the invoice includes an itemization of charges for materials, labor, lodging, and travel. Alafabco invoice 681 for $9,209, dated August 18, 1995, bears the same address. The subject of invoice 681 is the installation of a fan, and the prices are itemized as in invoice 676. Alafabco invoice 685 for $11,500 is addressed to Champion International, at its Courtland, Alabama, facility. Alafabco invoice 796, dated December 20, 1995, is addressed to "SCA Services, 6919 Flagstone Drive, Ooltewah, TN," and is in the amount of $4,000. The subject of invoice 796 is "Agusta Newsprint Doctor Blade maintenance."
The record further contains an instrument dated August 23, 1995, evidencing the loan of $31,659.49 from the Bank to Alafabco, namely, "Loan Number 3068814." The instrument specifically references invoice 676. The maturity date of that loan was November 21, 1995, at which time a "single payment of all principal and interest [was] due." The record contains a similar instrument dated August 31, 1995, evidencing the loan of $21,130.01, namely, "Loan Number 3068897." Loan Number 3068897 specifically referenced invoice 681 and invoice 685, and exhibited a maturity date of November 29, 1995. On that date, a "single payment of all principal and interest [was] due." These loans apparently financed the transactions evidenced by invoices 676, 681, and 685.
However, those projects all occurred in 1995, three years before the occurrence of any of the events made the basis of Alafabco's complaint or of the alleged defaults that precipitated the debt restructuring. There is no evidence indicating that Alafabco defaulted on either of those loans. Thus, for all that appears, those transactions had nothing to do with this controversy. In other words, the Bank made no showing as to what portionif anyof Loan Number 3068814 or Loan Number 3068897 remained unpaid at the time of the debt restructuring. It made no showing as to what portionif anyof the restructured debt was attributable to the 1995 loans. Having thus failed to show the quantity and quality of involvement of the North Carolina and Tennessee projects with the subject transaction, it showedat *805 mosta mere "proximity of [the subject transaction] to contracts substantially affecting interstate commerce." Sisters of the Visitation, 775 So.2d at 767. On the state of the record, in other words, the 1995 projects are wholly "separable" from the subject transaction. Id.
Moreover, under Sisters of the Visitation and its progeny, "the simple fact that loan proceeds are `mobile' does not require the conclusion that all loan transactions are inherently interstate in nature." Alternative Fin. Solutions, LLC v. Colburn, 821 So.2d 981, 986 (Ala.2001). Compare American Gen. Fin., Inc. v. Branch, 793 So.2d 738, 747 (Ala.2000), cert. denied, 534 U.S. 949, 122 S.Ct. 342, 151 L.Ed.2d 258 (2001), in which evidence was presented that indicated that the relevant loan proceeds actually moved in interstate commerce, as did the payments. The Bank, however, made no showing that proceeds, or payments, moved in interstate commerce, that is, it made no showing of arbitrability under the fourth Sisters of the Visitation factor ("subsequent movement across state lines").

III. Conclusion
In short, it is undisputed that the parties in this case are Alabama residents. The Bank did not show that any portion of the restructured debt was actually attributable to interstate transactions; that the funds comprising that debt originated out-of-state; or that the restructured debt was inseparable from any out-of-state projects. Consequently, the Bank failed to carry its burden of proof on the interstate-commerce issue.
For this reason, the trial court erred in granting the Bank's motion to compel Alafabco to arbitrate its dispute with the Bank. That order is, therefore, reversed, and the cause is remanded for further proceedings consistent with this opinion.
REVERSED AND REMANDED.
HOUSTON, LYONS, BROWN, JOHNSTONE, HARWOOD, and STUART, JJ., concur.
MOORE, C.J., concurs in the result.
SEE, J., dissents.
SEE, Justice (dissenting).
I believe that the majority erroneously reverses the trial court's order compelling arbitration; therefore, I respectfully dissent.

I.
First, the arbitration agreement is not made invalid under Alabama law simply because it provides that "[t]he Federal Arbitration Act shall apply to the construction, interpretation, and enforcement of this arbitration agreement." In 1986, Alafabco, Inc., and The Citizens Bank entered into a quasi-contractual relationship in which the Bank agreed to loan Alafabco funds to complete certain construction projects. In 1998, Alafabco defaulted on its obligations to the Bank. Thereafter, the parties negotiated an agreement that provided for the restructuring and redocumenting of Alafabco's existing debt to the Bank. As part of the debt-restructuring negotiations, Alafabco and the Bank executed "renewal notes" dated May 3, 1999, and signed an "Agreement to Arbitrate." The arbitration agreement included the following provision:
"GOVERNING LAW. The Federal Arbitration Act shall apply to the construction, interpretation, and enforcement of this arbitration agreement. The arbitration of any dispute shall be governed by the Rules of the American Arbitration Association. If there is an inconsistency between these rules and this Agreement, this Agreement shall govern."
After the restructuring, Alafabco again defaulted on its loan, and the Bank began *806 collection efforts. In September 1999, Alafabco filed a petition in bankruptcy pursuant to Chapter 11. The Bank moved for adequate protection of the property Alafabco had pledged to secure its obligations to the Bank. Alafabco and the Bank, both represented by counsel, negotiated a second debt-restructuring agreement, a second set of renewal notes dated December 10, 1999, and another arbitration agreement containing the same provisions as the May 3, 1999, arbitration agreement.
Alafabco sued the Bank on November 15, 2000, and the Bank moved to compel arbitration. Roger Campbell, president and chief executive officer of the Bank, and Doug Alexander, a vice president, submitted affidavits in support of the motion to compel arbitration. Campbell and Alexander both state in their affidavits that Alafabco was "provided with a completely free choice with regard to whether to simply allow The Bank to move forward with the legal rights it already possessed, or instead, to enter into the debt restructuring agreement at issue." They further state that, "[a]s a part of the debt restructuring agreement, alternative dispute resolution agreements were executed."
Alabama cases and statutes distinguish between predispute arbitration agreements, i.e., agreements executed before a dispute between the parties has arisen, and postdispute arbitration agreements, i.e., agreements to arbitrate executed after a dispute has arisen. While, under Alabama law, predispute arbitration agreements are unenforceable, agreements to arbitrate disputes that have already arisen are enforceable under the Alabama Arbitration Act (the "AAA") and at common law. Ala.Code 1975, § 6-6-1 and § 6-6-16; Fuerst v. Eichberger, 224 Ala. 31, 33, 138 So. 409, 410 (1931). Parties that enter into such postdispute arbitration agreements are aware of the nature of the complaint they are allowing to proceed to arbitration. Ex parte Allen, 798 So.2d 668, 676 (Ala.2001)(Moore, C.J., concurring in the result).
Alafabco and the Bank entered into their arbitration agreement after their dispute had arisen. Alafabco alleges in its complaint that the Bank breached its contract with Alafabco in 1998, thus causing Alafabco to "incur massive debt." Thereafter, because Alafabco's loans were delinquent, the parties negotiated the debt-reconstruction agreement that provided for the execution of the renewal notes and the arbitration agreement. The arbitration agreement provides: "The Federal Arbitration Act shall apply to the construction, interpretation, and enforcement of this arbitration agreement."
The main opinion concludes that "there is no evidence in this case of an agreement to proceed under the AAA or the common law." I am unaware of any authority, and the majority cites none, that requires that for a contract to be enforceable under Alabama law, the parties must affirmatively assert that they choose to proceed under Alabama law. In fact, if this Court concludes that federal law does not apply in this case, then, unless the law of some other jurisdiction is implicated, the agreement is not lawless, but, instead, it is subject to the application of Alabama law. See Cherry, Bekaert, & Holland v. Brown, 582 So.2d 502 (Ala.1991)(stating that, while the parties normally are allowed to choose what law they wish to apply to their agreement, Alabama law will govern the agreement if the parties' choice would run contrary to the public policy of Alabama), see also Restatement (Second) of Conflict of Laws § 187 (1977); 8 Samuel Williston, Williston On Contracts § 19:6 (Richard A. Lord, 4th ed.1998).[3]
*807 For the reasons I recite below, I believe that the Federal Arbitration Act governs this contract dispute, but, if, as the majority concludes, it does not, then, the agreement is governed by Alabama law. Under Ala.Code 1975, § 6-6-16, the parties entered a binding contract to arbitrate an existing dispute. They incorporated into their contract, by reference, the terms of the Federal Arbitration Act and the rules of the American Arbitration Association:
"The Federal Arbitration Act shall apply to the construction, interpretation, and enforcement of this arbitration agreement. The arbitration of any dispute shall be governed by the Rules of the American Arbitration Association."
This Court should construe those terms to give effect to the intent of the parties to enter a binding agreement;[4] thus, I believe the contract incorporates by reference the rules under which the parties intended the arbitration agreement to be interpreted. I am unaware of any authority, and the majority cites no authority, that stands for the proposition that these rules of construction, interpretation, and enforcement run contrary to the public policy of Alabama.

II.
Second, the dispute the parties agreed to arbitrate "involves commerce" and is, therefore, subject to the Federal Arbitration Act.
This Court reviews de novo a trial court's denial of a motion to stay its proceedings pending arbitration. Tefco Fin. Co. v. Green, 793 So.2d 755 (Ala.2001); Green Tree Fin. Corp. v. Vintson, 753 So.2d 497, 502 (Ala.1999). This Court has held that "`to prevail on an assertion of arbitrability, the moving party is required to produce some evidence which tends to establish its claim,'" Jim Burke Auto., Inc. v. Beavers, 674 So.2d 1260, 1265 (Ala. 1995) (opinion on application for rehearing) (quoting In re American Freight Sys., Inc., 164 B.R. 341, 345 (D.Kan.1994)), and "`has the burden of proving the existence of a contract calling for arbitration and proving that that contract involves a transaction affecting interstate commerce,'" Tefco Fin. Co. v. Green, 793 So.2d at 758 (quoting Ex parte Caver, 742 So.2d 168, 172 n. 4 (Ala.1999)(emphasis added)).
In Sisters of the Visitation v. Cochran, 775 So.2d 759, 763 (2000), the Sisters of the Visitation had contracted with an in-state contractor to renovate a chapel located in Alabama and owned by the Sisters. Pursuant to an arbitration provision in the contract, the Sisters sought arbitration of their dispute with the contractor. In my dissent in that case, I noted that the majority held that the Federal Arbitration Act can apply to a contract only if that "individual transaction `substantially affect[s]' interstate commerce." 775 So.2d at 782. Since our decision in Sisters of the Visitation in March 2000, this Court has routinely denied a party the right to arbitration where that party has failed to prove that the individual transaction substantially affected interstate commerce.
*808 See Aronov Realty Brokerage, Inc. v. Morris, 838 So.2d 348 (Ala.2002) (denying arbitration in an action brought by the purchaser of a condominium unit against a real estate brokerage, a real estate agent, and the condominium association); Liberty Nat'l Life Ins. Co. v. Douglas, 826 So.2d 806 (Ala.2002) (refusing to compel arbitration where an employee of an insurance company sued her employer); Ex parte Kampis, 826 So.2d 819 (Ala.2002) (denying arbitration in an action brought by the purchaser of a house against a contractor); Alternative Fin. Solutions, LLC v. Colburn, 821 So.2d 981 (Ala.2001) (denying arbitration where borrowers brought an action against lenders challenging the legality of certain loans); and Ex parte Learakos, 826 So.2d 782 (Ala.2001)(denying arbitration in an action brought by the purchaser of a house against a real estate company and its agents).
The Supreme Court of the United States stated in United States v. Lopez, 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), that in order for a federal statute that regulates commercial transactions to be a valid exercise of Congress's Commerce Clause power, the aggregate nationwide participation in that activitynot the individual transaction in isolationmust "substantially affect" interstate commerce. Lopez, 514 U.S. at 556-57, 115 S.Ct. 1624. This "substantial-effect" testused to determine the constitutionality of a statute under the Commerce Clausewas not a new standard created in Lopez, but has been the test of a statute's constitutionality since the early twentieth century. Id. at 555-57, 115 S.Ct. 1624.
Once it has been determined that Congress acted within its Commerce Clause power in enacting a statute, whether that statute reaches certain activities does not depend on whether that individual act, when considered separately from all similar acts, has a substantial effect on commerce. As Wickard v. Filburn, 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942), made clear, Filburn's "trivial" wheat production could be reached by the Agricultural Adjustment Act. The standard established by the Supreme Court of the United States is that "`where a general regulatory statute bears a substantial relation to commerce, the de minimis character of individual instances arising under that statute is of no consequence.'" Lopez, 514 U.S. at 558, 115 S.Ct. 1624 (quoting Maryland v. Wirtz, 392 U.S. 183, 197 n. 27, 88 S.Ct. 2017, 20 L.Ed.2d 1020 (1968)).
The standard for the application of the Federal Arbitration Act to an individual contract was made clear to us in Allied-Bruce Terminix Cos. v. Dobson, 513 U.S. 265, 267, 115 S.Ct. 834, 130 L.Ed.2d 753 (1995). The Federal Arbitration Act provides in pertinent part that "a contract evidencing a transaction involving commerce... shall be valid...." 9 U.S.C. § 2 (emphasis added). The Supreme Court of the United States held in Allied-Bruce Terminix that the requirement of the Federal Arbitration Act that an individual contract involve interstate commerce should be read in the broadest possible terms because the word "involving" signals an intent to "exercise Congress' commerce power to the full." 513 U.S. at 277, 115 S.Ct. 834. The Court also stated that a contract, to be subject to the Federal Arbitration Act, did not have to evidence a transaction that was "substantially interstate." 513 U.S. at 269, 115 S.Ct. 834.
Thus, I believe this Court erred when it held in Sisters of the Visitation that a particular contract, in order to be enforceable under the Federal Arbitration Act must, by itself, have a substantial effect on interstate commerce, and this Court errs again today by applying the Sisters of the Visitation standard to this case.
*809 Campbell states in his affidavit that "prior to May 3, 1999, [Alafabco] borrowed substantial funds from The Bank, on multiple occasions, for the purposes of covering business operation expenses, including labor and material expense for performing jobs for Champion International at that entities [sic] Kenton, North Carolina facility, as well as the Courtland, Alabama facility. These loans were not repaid at the time Alafabco began Chapter 11 bankruptcy proceedings." Campbell and Alexander both state in their affidavits that, "the loans issued by The Citizens Bank and the debt restructuring at issue facilitated the operation of Alafabco, Inc., which did business affecting interstate commerce, and directly engaged in interstate commerce, including contract work in North Carolina and the state of Tennessee, as demonstrated by the attached records."
Attached to Campbell's affidavit are invoices of interstate transactions. The invoices indicate that Alafabco sold equipment and materials and provided services to Champion International in Canton, North Carolina, and Ooltewah, Tennessee.
Based on the foregoing evidence presented by the Bank in support of its motion to compel arbitration, I conclude that the Bank presented the requisite "`some evidence which tends to establish [its] claim,'" Jim Burke Auto., 674 So.2d at 1265 (quoting In re American Freight Sys., Inc., 164 B.R. 341, 345 (D.Kan.1994)), indicating that the Bank's loans to Alafabco "involve commerce." Therefore, I would affirm the trial court's decision to compel arbitration.
NOTES
[1] The bank loans were secured by invoice numbers of the jobs to be performed by Alafabco. Appellant's Brief, at 3.
[2] In fact, we need notand do notdecide whether the Arbitration Agreements are predispute or postdispute agreements.
[3] Williston writes:

"The reasoning behind the Restatement rule that where the parties have chosen a law that would render the contract invalid, their choice will not be applied unless it would have applied absent their agreement is that the parties would not purposely have chosen a law that would invalidate a bargain, and that their (apparently) mistaken choice should be ignored in favor of protecting their expectation that they entered an enforceable bargain."
8 Williston, § 19:6, at 161-63 (footnote omitted).
[4] See Homes of Legend, Inc. v. McCollough, 776 So.2d 741, 746 (Ala.2000) (stating that where there is a choice between a valid construction and an invalid construction, the court has a duty to accept the construction that will uphold, rather than destroy, the contract and that will give effect and meaning to all of its terms).